[Crim. No. 15795. In Bank. May 23, 1972.]

THE PEOPLE, Plaintiff and Respondent, v.
HENRY MACIAS NAVARRO, Defendant and Appellant.

252

## COUNSEL

Robert A. Martin, under appointment by the Supreme Court, for Defendant and Appellant.

Evelle J. Younger and Thomas C. Lynch, Attorneys General, and Robert R. Granucci, Deputy Attorney General, for Plaintiff and Respondent.

## OPINION

**McCOMB, J.**—Henry Macias Navarro was charged with two violations of section 11501 of the Health and Safety Code (selling and furnishing heroin, offering to sell) and a prior conviction (assault with a deadly weapon, Pen. Code, § 245). He pleaded not guilty and denied the prior. His motion to suppress evidence under section 1538.5 of the Penal Code was denied. At the trial he did not testify but his counsel vigorously defended on the grounds of entrapment and illegal seizure of evidence. The jury found him guilty on each count. Review of the evidence indicates that it was sufficient to support the verdict.[1]

After the jury returned its verdict the court suspended imposition of sentence to conduct proceedings authorized by section 3051 of the Welfare and Institutions Code[2] to ascertain if Navarro was a narcotic addict or in imminent danger of becoming one, for the purpose of considering commitment to the custody of the Director of Corrections for confinement in the narcotic detention, treatment and rehabilitation facility (§§ 3001, 3300). It found that Navarro was a narcotic addict. The court then held a sentencing hearing to determine whether section 3052 precluded the commitment of Navarro to the treatment program.[3]

---

[1]On September 12, 1968, Sergeant Stanley E. Shaver, narcotics investigation, sheriff's department, employed Pauline Perez (who had told him that she had purchased heroin from Navarro within a few days prior) to assist in a narcotics investigation by attempting to purchase heroin from Navarro. On each occasion she was searched, equipped with a Fargo transmitter, and given a sum of money with which to make a purchase; she consented to and did make a telephone call to Navarro to arrange a meeting with him knowing that the call was being recorded by the officers. On September 12 she purchased a usable quantity of heroin from Navarro. On September 17 she met Navarro as pre-arranged but he left to purchase heroin from someone else for her, did not return, and no sale was consummated. Shaver observed both encounters between Navarro and Miss Perez and was able to identify the voice on the phone and over the Fargo transmitter as that of Navarro.

[2]All citations herein are to the Welfare and Institutions Code unless otherwise indicated.

[3]All references to "treatment program" are to the program provided for in the narcotic addicts law, section 3000 et seq.

Section 3052 makes absolutely ineligible for that program persons who are convicted of, or who have previously been convicted of, certain crimes, specifically including violation of section 245 of the Penal Code, assault with a deadly weapon. Section 3051 modifies this by providing that "In any case to which Section 3052 applies, the judge may request the district attorney to investigate the facts relevant to the advisability of commitment pursuant to this section. In unusual cases, wherein the interest of justice would best be served, the judge may, with the concurrence of the district attorney and defendant, order commitment notwithstanding Section 3052."

The prior conviction was admitted by Navarro and he expressed his desire for commitment to the treatment program. His counsel argued that Navarro's prior conviction was, pursuant to section 17 of the Penal Code, made a misdemeanor by sentence (commitment to the California Youth Authority); that section 3052 contemplates only *felony* offenses; and that if the district attorney refused to concur in the proposed commitment to the treatment program, such refusal should be based on facts peculiar to this case and not on the fact that a defendant pleaded not guilty or, as here, called the prosecution's informant as a defense witness.

The court held that it had no authority to inquire into the reasons for the concurrence or nonconcurrence of the district attorney.

The district attorney refused to concur but he did state his reasons: that Navarro was, by conviction, a seller of heroin and this merited a state prison sentence; that the prior conviction involved the stabbing of two people; that whether or not the prior conviction was a felony or a misdemeanor Navarro had admitted a prior *felony* and had raised no objection at the time it was in that posture before the court; that he had polled the jury after the guilt trial and they were of the opinion that a state prison sentence should be given; that the probation report indicated that Navarro did not have an "uncontrollable habit"; that he found no sincere desire on the part of Navarro to seek rehabilitation; that if Navarro did recognize the wrongfulness of his prior conduct he would seek to cooperate with the various authorities; and that on a variety of factors he felt that Navarro did not belong in the California Rehabilitation Center but belonged in state prison.

Navarro testified in his own behalf that he was not really a "dealer," that he needed rehabilitation as an addict, and that he would like to get help and treatment. His counsel argued that there was no evidence in the record that Navarro was a "big supplier"; that there was evidence of his addiction; that Navarro had had a daily habit for two years and had tried to go off

it a few times without success; and that he might be more amenable to the treatment program than if he had a severe long-term habit.

The court thereupon stated for the record that it found section 3052 made inapplicable section 3051 to this defendant and to this case. It further stated that "if the court were wrong . . . if section 3051 did apply to this case, that the Court would commit this defendant to the rehabilitation center. I find that I have no authority to do so." It denied probation and committed Navarro to state prison for the term to be set by law, sentences to run concurrently on each count.

Subsequent to entry of judgment herein this court decided in *People* v. *Tenorio* (1970) 3 Cal.3d 89 [89 Cal.Rptr. 249, 473 P.2d 993], that section 11718, Health and Safety Code, which required approval and action by the district attorney in order for the court to dismiss a prior conviction, violated the separation of powers doctrine and the vesting of judicial power in the judiciary. (Cal. Const., art. III, art. VI, § 1.) In *Esteybar* v. *Municipal Court* (1971) 5 Cal.3d 119 [95 Cal.Rptr. 524, 485 P.2d 1140], this court struck, on the same grounds, the provision in Penal Code section 17, subdivision (b)(5), which required the consent of the prosecutor to be obtained before a magistrate could exercise his judicial power to determine that a charged offense was to be tried as a misdemeanor. We denied hearing in *People* v. *Clay* (1971) 18 Cal.App.3d 964 [96 Cal.Rptr. 213], in which the Court of Appeal invalidated, on the same grounds, the provision in section 1203 of the Penal Code which required district attorney concurrence in order for the court to grant probation to a class of defendants. *Tenorio* expressly declared its retroactive effect on sentencing procedures (*supra,* 3 Cal.3d 89, 95, fn. 2), and stated that any prisoner suffering a sentence imposed after the effective date of section 11718, Health and Safety Code (Sept. 18, 1959) and prior to the filing of *Tenorio* (Sept. 1, 1970) could file a habeas corpus petition with the superior court inviting the exercise of its discretion to hold a new sentence hearing for the purpose of dismissing the prior conviction. In *In re Cortez* (1971) 6 Cal.3d 78, 88-89 [98 Cal.Rptr. 307, 490 P.2d 819], we further outlined the procedure to be followed.

Navarro has therefore raised on this appeal not only the issue that the requirement of district attorney concurrence in section 3051 be declared constitutionally invalid but that, if he does not prevail on that issue, the case be remanded to the trial court for sentencing so that court may consider the question whether it should strike the prior conviction, as authorized by *Tenorio* and thus have "authority" to carry out its expressed desire to commit Navarro to the treatment program. He also argues alternative grounds: 1, that section 3052 applies only to *felony* convictions for the offenses stated, that by sentence to the Youth Authority the court had made his prior con-

viction only a misdemeanor, and therefore section 3052 does not apply to him; and 2, that by reason of his honorable discharge from the Youth Authority[4] he was statutorily and automatically released from all "penalties and disabilities" resulting from his prior conviction (§ 1772) and this included release from the ineligibility provisions of section 3052.

Unlike the defendants in *Tenorio* and *Cortez,* Navarro's prior conviction was for a non-narcotics offense. In those cases striking of prior *narcotics* convictions was sought in order that the statutorily increased penalty for the current narcotics conviction might be avoided, in the discretion of the court. Here, striking a prior non-narcotics conviction would make inapplicable a statutorily imposed restriction on Navarro's eligibility for the treatment program. The rationale of allowing the sentencing court, in its discretion, to strike the prior conviction is as persuasive in *Navarro* as in *Tenorio* and *Cortez.* ■ Availability of such relief is not limited to proceedings where the question of striking priors was raised below. (See *In re Cortez, supra,* 6 Cal.3d 78, 87-88.)

However, the more important issue is here directly presented, to which this court must address itself, and that is whether section 3051 is itself tainted with constitutional infirmity—violation of the separation of powers mandate and the vesting of judicial powers in the judiciary required by the California Constitution. This issue has been considered by the Court of Appeal, subsequent to this conviction and subsequent to *Tenorio,* with conflicting results. *People* v. *Rotsell* (Cal.App.) 92 Cal.Rptr. 542, held that the requirement of district attorney concurrence in section 3051 as a prerequisite to a defendant's being committed to the treatment program as an unusual case, was an unconstitutional restraint on the exercise of the judicial function.[5] *People* v. *Harris* (1971) 17 Cal.App.3d 388 [95 Cal.Rptr. 80], held that even if it was unconstitutional this provision was not severable and if declared invalid the whole amendment, making absolute ineligibility merely conditional, should be deleted. As above noted there are other alternative grounds for decision raised by Navarro on this appeal.

---

[4]Navarro's arrest record, attached as an exhibit to the probation report, shows that he was discharged on November 29, 1963, but does not disclose the nature of the discharge. Pursuant to Evidence Code, sections 459, 452, subdivision (c), he now requests this court to judicially notice the official acts of the California Department of Youth Authority, an executive department of the state. Defendant has submitted as an aid to this court a letter dated August 17, 1970, written by the then Administrative Officer of the Department of Youth Authority, Paul J. McKusick, advising that after the 1958 commitment Navarro completed a period of training in the Authority's Ben Lomond Youth Conservation Camp, was then transferred to parole, and received an honorable discharge on November 29, 1963, because of his good record on parole.

[5]We granted a hearing in *Rotsell* to consider this issue, but the appeal was thereafter dismissed at the defendant's request.

■■ *Question*: One (a) *Is section 3051 of the Welfare and Institutions Code unconstitutional insofar as it requires the concurrence of the district attorney in order for the court, when it has found a case to be an unusual one in which the interest of justice requires commitment to the treatment program, notwithstanding section 3052, to make such commitment? (b) If unconstitutional, is this requirement severable from the rest of the provision so that the judge may, in such a case, make a commitment to the treatment program?*

We must answer each of these questions in the affirmative.

The issue of district attorney concurrence is squarely presented because he refused to concur. Although the present proceedings relate to section 3051 (conviction in superior court) the identical provision in section 3050 (conviction in municipal court) is unavoidably in issue.

■ Defining offenses and prescribing punishments (mandatory or alternative choices) are legislative functions designed to' achieve legitimate legislative goals and objectives. ■ The imposition of sentence and the exercise of sentencing discretion are fundamentally and inherently judicial functions. (*People* v. *Burke* (1956) 47 Cal.2d 45, 52 [301 P.2d 241].)[6] Section 12 of the Penal Code recognizes this in its declaration that "The several sections of this code which declare certain crimes to be punishable as therein mentioned, devolve a duty upon the court authorized to pass sentence, to determine and impose the punishment prescribed." ■ The Legislature may impose restrictions upon the exercise of that function (i.e., mandatory consideration of probation report, reception of evidence in mitigation or aggravation of punishment, Pen. Code, §§ 1203d, 1204). ■ It may limit the use of prescribed sanctions (sentences) to "unusual cases, wherein the interest of justice would best be served, . . ." This phrase, as used in section 3051, clearly implies that the determination whether this is such an unusual case is to be made by the sentencing judge. The section authorizes him to request the district attorney *to investigate* the facts relevant to the advisability of commitment in any case to which section 3052 applies. There is nothing to indicate that anyone other than the sentencing judge is to weigh these facts and whatever other facts or arguments might be presented at the hearing.

■ When an individual judge exercises sentencing discretion he exer-

---

[6]As this court noted in *People* v. *Tenorio, supra,* 3 Cal.3d 89, 94-95, analogies to other forms of sentencing discretion cannot excuse the invasion of judicial power. The actual imposition of sentence is a judicial function which can be performed only by a court. (*In re Sandel* (1966) 64 Cal.2d 412 [50 Cal.Rptr. 462, 412 P.2d 806].) *Jury* sentencing is authorized by the California Constitution (art. I, § 7).

cises a judicial power which must be based upon an examination of the circumstances of the particular case before him, and which is subject to review for abuse. (*People* v. *Tenorio, supra,* 3 Cal.3d 89, 95.) Here, as in *Tenorio* and *Esteybar* the Legislature sought to vest the district attorney with unreviewable powers. It is irrelevant to the issue before us that the district attorney here fully stated reasons for his nonconcurrence. With or without a statement of reasons, the mere statement "I do not concur" would have destroyed the judge's power to choose a sentencing alternative otherwise made available to him by the Legislature. The trial court correctly held that it was without power to review the district attorney's discretion. No guidelines are given by the Legislature for appellate review of the sentencing power here conferred independently and simultaneously on the court and the prosecutor—a power to be exercised *after* the sentencing court has judicially determined that the defendant, under the facts and the law, should be committed.

We reiterate the statement made by Justice Schauer in his dissent in *People* v. *Sidener* (1962) 58 Cal.2d 645, 654 [25 Cal.Rptr. 697, 375 P.2d 641], in his analysis of the separation of powers doctrine, that "It bears reiteration that the Legislature, of course, *by general laws* can control eligibility for probation, parole and the term of imprisonment, but it cannot abort the *judicial process* by subjecting a judge to the control of the district attorney."[7]

We therefore hold that that portion of section 3051 which requires the concurrence of the district attorney violates the California Constitution's requirement that the judicial power be vested in the judiciary and that the powers of government be separated into the executive, the legislative, and the judicial. (Art. VI, § 1; art. III.)

We find no merit in the argument that the section is valid because the court has no *inherent* power to commit to this particular treatment program. A similar argument was raised in *Esteybar* v. *Municipal Court, supra,* 5 Cal.3d 119. We there held (p. 127) "While it may be conceded that the

---

[7] If a trial judge lacks the necessary expertise to make proper sentencing decisions, the answer does not lie in conditioning its exercise upon the consent of the prosecutor but in better trained and selected judges, plus tools such as trained probation staff, presentence reports, range of sentencing alternatives, and diagnostic commitments; sentencing institutes and seminars to acquaint the judge with the usefulness of the various sentencing alternatives in relation to the different types of offenders and to assist him in the development of sophisticated skills for interpreting presentence and psychiatric evaluations; cooperation of the prosecution in presenting accurate and complete sentencing data, and cooperation of defense counsel in verifying the accuracy of the information presented and suggesting plausible sentencing alternatives, —so that the judge in performing his judicial duties can make the choice which will best carry out legitimate legislative goals and objectives.

Legislature in the first instance was not required to give the power to a magistrate to determine whether to hold a defendant to answer to a felony or a misdemeanor charge, having done so, the Legislature cannot condition its grant upon the approval of the district attorney." In *People* v. *Clay, supra,* 18 Cal.App.3d 964, the same conclusion was reached as to a legislatively conferred power to grant probation. Here, too, although the Legislature was not required in the first instance to give the court power to commit persons in the status of Navarro to the treatment program, having conferred this power it cannot condition its exercise upon the approval of the district attorney.

 We hold, therefore, that the concurrence requirement of section 3051, and section 3050, is invalid.

(b) *The concurrence requirement is severable from the rest of the 1963 amendment to section 3051.*[8]

 When part of a statute is declared unconstitutional the remainder will stand if it is complete in itself and would have been adopted by the legislative body had the latter foreseen the partial invalidation. (*In re Bell* (1942) 19 Cal.2d 488, 498 [122 P.2d 22].) Deletion of the challenged provision would leave a coherent amended statute complete in itself, but the critical inquiry is whether the Legislature would have adopted the entire amendment had it foreseen the partial invalidity thereof? (*In re Perez* (1966) 65 Cal.2d 224, 232 [53 Cal.Rptr. 414, 418 P.2d 6].) Generally, unconstitutional provisions do not vitiate the whole act unless they enter so entirely into the scope and design of the law that it would be impossible to maintain it without such obnoxious provisions. (*Danskin* v. *San Diego Unified Sch. Dist.* (1946) 28 Cal.2d 536, 555 [171 P.2d 885]; *People* v. *Lewis* (1939) 13 Cal.2d 280, 284 [89 P.2d 388]; *People* v. *Clay, supra,* 18 Cal.App.3d 964, 971.)

It is not to be presumed that the Legislature would deliberately enact a statute prohibited by the Constitution. Wherever statutes conflict with constitutional provisions, the latter must prevail. (*Hart* v. *Jordan* (1939) 14 Cal.2d 288, 292 [94 P.2d 808].) As part of the Welfare and Institutions Code, section 3051 is governed by the general rules of construction contained in the preliminary provisions thereof (Gov. Code, § 9603), and the provisions of section 18 of the Welfare and Institutions Code.

---

[8]Sections 3051 and 3052 were part of the original narcotic addict law (Stats. 1961, p. 2223, former §§ 6451, 6452, Pen. Code). In 1963 former Penal Code section 6451 was amended to include the challenged provision, and both section 6451 and section 6452 were carried forward into the re-enactment of the law in the Welfare and Institutions Code (Stats. 1965, p. 3062).

■ This reads: "If any provision of this code, or the application thereof to any person or circumstance, is held invalid, the remainder of the code, or the application of such provision to other persons or circumstances, shall not be affected thereby." Such a statement though not conclusive is persuasive evidence of legislative intent. (*Fort* v. *Civil Service Commission* (1964) 61 Cal.2d 331, 339-340 [38 Cal.Rptr. 625, 392 P.2d 385]; see 3 Witkin, Summary of Cal. Law (7th ed. 1960) p. 1882.)

■ A reviewing court may look at the history and purposes of the legislation in order to determine whether the Legislature would prefer invalidation of the invidious portion of the statute rather than invalidation of the whole section, and would have made such choice had it considered the constitutional issue. (See *Hayes* v. *Superior Court* (1971) 6 Cal.3d 216, 224-225 [98 Cal.Rptr. 449, 490 P.2d 1137].)

We turn then to a consideration of the California narcotic addict law.[9] The Governor's 1961 Special Study Commission on Narcotics[10] resulted in a substantial revision of California's narcotics laws, the establishment of procedures for the commitment, release and discharge of narcotic addicts and the establishment of the California Rehabilitation Center and its branches, under the jurisdiction of the Department of Corrections.

The statute was held to be constitutional (*In re De La O* (1963) 59 Cal.2d 128 [28 Cal.Rptr. 489, 378 P.2d 793, 98 A.L.R.2d 705]), and thereafter the Legislature modified the act to remove the external indicia of criminality pointed out in *De La O*. (Stats. 1963, p. 3354.) The act provides for civil commitment and treatment of narcotic addicts by involuntary commitment of persons charged with a crime (§ 3050) and involuntary commitment of persons not charged with a crime (§ 3100); for supervision of the addicts in the community through an intensive outpatient program with

---

[9]See Burke, *Striking Priors* (1958) 33 State Bar J. 556, 567-568, suggesting basic content of treatment program for addicts later adopted in California.

[10]2 Senate Journal Appendix (Reg. Sess. 1961); 1 Senate Journal (1961) pages 258-259. The Interim Report of January 16, 1961, included findings that the narcotic traffic in California was carried on almost entirely by addict-peddlers, that many addicts were spreading addiction in order to support their habit and to make tremendous profits; recommended legislation not only for the purpose of treating hard-core addicts but for getting the addict-peddlers off the streets, to provide rehabilitation for them in a drug-free environment, with adequate after-care supervision, to prevent the spread of addiction, the contamination of the public and to protect society, and recommended an extensive research program in connection therewith. There was then no integrated program of hospital, psychiatric care and rehabilitation for addicts. Hospitals would accept only voluntary patients. The original recommendation was for establishment of a treatment facility within the Youth Authority; the Final Report recommended that it be in Mental Hygiene; as finally adopted by the Legislature, it was placed in the Department of Corrections.

return of outpatient addicts to the California Rehabilitation Center for further treatment if they are detected returning to drug use; and for long-range intensive research to probe causes, improve methods of control, and ultimate cure or prevention of narcotics addiction.

In *People* v. *Ortiz* (1964) 61 Cal.2d 249 [37 Cal.Rptr. 891, 391 P.2d 163], in remanding proceedings for the determination of whether that defendant was a narcotic addict and entitled to consideration for commitment to the treatment program, we noted (pp. 254-255) that "[T]he discretion thereby vested in the court should be exercised with a view to implementing, rather than possibly frustrating, the strong legislative policy disclosed by the enactments creating and governing the narcotic addict rehabilitation program. That policy, responsive to the current medico-social approach to the issue of drug addiction [citation] favors inquiry into the addictive status of *all* criminal defendants whose record indicates the presence of an addiction problem." In *People* v. *Victor* (1965) 62 Cal.2d 280 [42 Cal.Rptr. 199, 398 P.2d 391], we reversed a commitment, on grounds not here pertinent, and commented (p. 291, fn. 5) on the Legislature's "commendable modification of the formerly absolute rule of ineligibility" referring to the 1963 amendment here in issue. In *People* v. *Ortiz, supra,* 61 Cal.2d 249, we also noted the fact that the amendment required district attorney concurrence. However, the validity of the concurrence requirement was not before the court in either case. In another connection we stated in *Victor* (62 Cal.2d at p. 295) the general rule that this court will not adjudicate the technical niceties of statutory construction unless and until upon claimed impairment of the constitutional rights of a person subjected to its operation the issue is squarely presented.

From a review of the history and content of the act and of the strong legislative policy favoring implementation of this program for the commitment and treatment of narcotics addicts, we find that although it is possible that the Legislature would not have authorized the court to make commitments, notwithstanding section 3052, without the concurrence of the district attorney, this is by no means "manifest." No rewriting of the statutory scheme is involved should the severable portions be deleted. Should the entire amendment be declared invalid the basic intention of the Legislature to allow exceptions to be made where the interest of justice requires, could not be carried out. It does not appear that *but for* the concurrence provision the Legislature would not have modified the exclusionary rule of section 3052.

Commitment to the treatment program, should it be ordered by the court below on remand of these proceedings, is not a guarantee that Navarro will be retained therein. The Legislature has made various provisions

not only for pre-screening but for rejection of persons who are determined not to be fit subjects for commitment in the expertise opinion of the professional staff by allowing their return to court by the Director of Corrections (see § 3053).

By section 3051 (and § 3050) the judge *is required in all instances* whenever it appears to him that the defendant may be addicted or in imminent danger of becoming addicted, to adjourn the proceedings or suspend the imposition of sentence. Proceedings must then be conducted to ascertain if such person is addicted or in imminent danger thereof "unless, *in the opinion of the judge,* the defendant's record and probation report indicate such a pattern of criminality that he does not constitute a fit subject for commitment under this section." (Italics added.) If found to be a narcotic addict or in imminent danger thereof the judge *"shall make* an order committing such person to the custody of the Director of Corrections for confinement in the facility until such time as he is discharged . . . ." (Italics added.)

Section 3052 withholds from eligibility persons convicted of certain offenses, apparently on the basis that persons who commit such crimes are of a character and nature that would tend to render them less amenable to the services and program offered, either because of excessive criminality, because criminality is not a by-product of their narcotic addiction, or because they have other major problems over and beyond addiction which would interfere with their amenability to treatment or to the integrity of the program. However, section 3051 recognizes that individual consideration should be given to persons falling within section 3052. Exceptions should be made where so warranted.

Section 3053 provides that at any time following receipt of any person at the California Rehabilitation Center the Director of Corrections may return him or her to the committing court if he concludes that such person, because of excessive criminality or for other relevant reason, is not a fit subject for commitment.[11]

It would not appear, from the cold record, that Navarro fell within any of the four "unfitness for commitment" categories indicated by Superintendent Wood with the exception perhaps of the third. All that appears as to

---

[11]Unfitness for the program has generally been found, in those cases returned by that program to court under section 3053, to fall into four classes: 1. excessive criminality which transcends his addiction; 2. excessive involvement in sales activity far exceeding the need to support his own habit; 3. use of dangerous or deadly weapons at the time of commission of offense; and 4. escape potential. (1967 Sentencing Institute for Superior Court Judges (West. Publ. Co.) pp. 95, 98, statement by Roland W. Wood, superintendent, California Rehabilitation Center.)

the prior assault committed 12 years earlier is that two persons were stabbed. No aggravating or mitigating circumstances are stated. Violence potential and escape potential of Navarro at the time of the prior conviction could be considered in the framework of the sentence then given him by the court, commitment to the Youth Authority, and the program given him by the authority, placement in an open forestry camp. Hard work, group involvement, assumption of responsibility, reliability, minimum violence and escape potential are necessarily basic to such placement. Subsequent to Navarro's honorable discharge and prior to the present charges, his only apparent brushes with the law were for nonsupport of his wife. At the time of sentence hearing there was evidence that he was working, making support payments, and had a good record of employment. But he was a narcotic addict.

It cannot be held, therefore, that there was any abuse of discretion by the judge in his decision that this was an "unusual case" in which commitment to the treatment program was in the interest of justice. While this does not affect the issue of law—the constitutionality of the concurrence requirement in section 3051—it does tend to support the conclusion that the Legislature's basic concern in making the amendment appearing in section 3051 was to allow exceptions to be made, in individual cases such as this, to the absolute prohibition stated in section 3052, and that its principal concern was not district attorney concurrence but the strengthening of the provisions of the act in order to accomplish the aims so strongly stated in section 3000.[12]

We, therefore, hold that the invidious provision in the 1963 amendment, appearing in sections 3051 and 3050, is severable from the remainder of the 1963 amendment. We hereby disapprove *People* v. *Harris, supra,* 17 Cal.App.3d 388, 394-396, insofar as it holds to the contrary.

The same legislative policy in favor of commitments to the treatment program, however, also leads us to hold that the language of the amendment purporting to require the *defendant's concurrence* is not sever-

---

[12]Section 3000: "It is the intent of the Legislature that persons addicted to narcotics, or who by reason of repeated use of narcotics are in imminent danger of becoming addicted, shall be treated for such condition and its underlying causes, and that such treatment shall be carried out for nonpunitive purposes not only for the protection of the addict, or person in imminent danger of addiction, against himself, but also for the prevention of contamination of others and the protection of the public. Persons committed to the program provided for in this chapter who are uncooperative with efforts to treat them or are otherwise unresponsive to treatment nevertheless should be kept in the program for purposes of control. It is the further intent of the Legislature that persons committed to this program who show signs of progress after an initial or subsequent periods of treatment and observation be given reasonable opportunities to demonstrate ability to abstain from the use of narcotics under close supervision in outpatient status . . . ."

able from the provision for district attorney concurrence and hence must fall therewith. The entire statutory scheme manifests the Legislature's intent that a defendant's lack of desire for, or lack of cooperation with, the treatment program should not defeat his commitment. Commitment to this program is not consensual but involuntary, although by civil process. (See generally *In re De La O, supra,* 59 Cal.2d 128, 135-145, 148-149.) We cannot believe the Legislature would have adopted the provision for the defendant's concurrence in section 3051 (and § 3050) had it foreseen the invalidity of the requirement of district attorney concurrence, which we now declare.[13]

Two: (a) *Does section 3052 include only those convictions which are felonies by statute or by sentence? (b) If so, was Navarro's prior conviction made a misdemeanor by sentence and therefore not within section 3052?*

The answer to each is in the affirmative. It is not imperative to the present appeal to determine the questions herein numbered Two and Three, in view of our conclusion that the concurrence requirement of section 3051 is invalid and that notwithstanding section 3052 the judge may, in his discretion, commit Navarro to the treatment program. However, section 3052 otherwise directly applies to Navarro, the issues stated are squarely presented, and a determination thereof is proper. Also, this may have some future significance to the offense history of Navarro and other defendants similarly situated who were convicted as youthful offenders and committed to the California Youth Authority (question Two) and thereafter received

---

[13]For the reasons stated in *People* v. *Tenorio, supra,* 3 Cal.3d 89, 95-96, footnote 2, today's decision is, in principle, fully retroactive, and all persons affected thereby may seek to enjoy its benefits by writ of habeas corpus. In distinction to *Tenorio,* however, we vindicate here a statutory right which by its very nature is self-limiting from the standpoint of time, as it can be invoked only by those petitioners who are presently entitled to be considered for commitment to the California Rehabilitation Center, i.e., who are presently addicts or in imminent danger of addiction by reason of repeated use of narcotics.

Accordingly, any prisoner otherwise ineligible for commitment to the California Rehabilitation Center by reason of section 3052 may file a habeas corpus petition with the superior court inviting the exercise of its discretion to order such commitment notwithstanding section 3052 on the ground that the case is an "unusual" one "wherein the interest of justice would best be served," provided he can make a prima facie showing that (1) he is under a sentence imposed after the effective date (Sept. 20, 1963) of the statutory language here held invalid, (2) at the time of his conviction he was an addict or in imminent danger of addiction, and (3) at the time of filing his petition for habeas corpus he is an addict or in imminent danger of addiction. The longer a petitioner has spent in custody, of course, the more difficult it will be for him to make a showing of the latter condition. (See *People* v. *Victor, supra,* 62 Cal.2d 280, 295, fn. 11 [42 Cal.Rptr. 199, 398 P.2d 391].) In the event a sufficient showing is made, the court should follow insofar as practicable the procedural steps prescribed in *In re Cortez, supra,* 6 Cal.3d 78, 88-89.

an honorable discharge (question Three), and thus avoid a multiplicity of suits.

The offenses listed in section 3052 involve generally acts with long-term minimum sentences (murder, assault with intent to commit murder, attempt to commit murder, kidnaping, robbery, first degree burglary, mayhem, assault with a deadly weapon); crimes against the person and against public decency and good morals (Pen. Code, §§ 261-269b, with the exception of former § 261, subd. 1 [now § 261.5]); and "felonies" involving bodily harm or attempt to inflict bodily harm or any offenses set forth in section 11500 et seq. (illegal sale, possession, etc. of narcotics other than marijuana), section 11530 et seq. (marijuana), or section 11710 et seq. (forged or altered prescriptions) of the Health and Safety Code, "for which the minimum term prescribed by law is more than five years in state prison." This statute has been strictly construed. In *People* v. *Ibarra* (1963) 60 Cal.2d 460 [34 Cal.Rptr. 863, 386 P.2d 487], the statute was held to be not applicable where prior conviction carried a minimum term of five years, because the statute reads "more than five years." Some of these offenses have optional sentences. Most are declared to be felonies, and in the narcotics offense sections, section 11504 expressly declares that they are felonies "regardless of sentence." There are only a few isolated offenses which do not have a prescribed prison term, mandatory or optional (Pen. Code, § 266c, importing Chinese or Japanese women for slavery or sale; §§ 269a and 269b, adultery).

 It is reasonable to conclude that in enacting section 3052, the Legislature intended to include only such offenses as were made felonies by statute or by sentence, and to include offenses which are made felonies irrespective of sentence.

(b) *Navarro's prior conviction was a misdemeanor by sentence.*

Assault with a deadly weapon (Pen. Code, § 245) carries optional sentences. In 1958, when Navarro was convicted of that crime, the authorized sentences were imprisonment in the state prison not exceeding 10 years, in a county jail not exceeding one year, fine, or both fine and imprisonment. Section 17 of the Penal Code then provided: "A felony is a crime which is punishable with death or by imprisonment in the state prison. Every other crime is a misdemeanor. When a crime, punishable by imprisonment in the state prison, is also punishable by fine or imprisonment in a county jail, in the discretion of the court, it shall be deemed a misdemeanor for all purposes after a judgment imposing a punishment other than imprisonment in the state prison." The court was given discretion to choose the sentence, but after imposition of a "punishment other than imprisonment in the state prison" the offense was thereafter a misdemeanor for all purposes.

Section 17 contained this identical language in 1941 when the Youth Authority was created, in 1943 when the authority was given control of the state reform schools and in 1958 when Navarro was convicted of assault with a deadly weapon and committed to the authority. It was first amended to specifically refer to commitments to the Youth Authority based on optional sentence offenses in 1947, this amendment being deleted in 1957.[14] In 1959 it was amended to provide: "Where a court commits a defendant to the Youth Authority upon conviction of a crime punishable, in the discretion of the court, by imprisonment in the state prison or fine or imprisonment in a county jail, the crime shall be deemed a misdemeanor." This section has since been recast into lettered subdivisions but still provides, in present subdivision (b) (2), that such an offense is a misdemeanor for all purposes when the court commits the convicted person to the authority.

The Youth Authority Act provided for commitment to the California Youth Authority of any person convicted of a public offense (a) who was found to be less than 21 years at the time of apprehension, (b) was not sentenced to death, imprisonment for life or for 90 days or less, or payment of a fine; and (c) was not granted probation. (§ 1731.5.)[15] The court has no power to suspend execution of the commitment once made (with exceptions as to the juvenile court) (§ 1737). The act specifically declares that the commitment is "a judgment within the meaning of Chapter 1 of Title 8 of Part 2 of the Penal Code, and is appealable." (§ 1737.5.)[16] We held

---

[14]The Senate Journals indicate that both the 1947 amendment and the 1957 deletion of that amendment were introduced into the Legislature at the request of the Youth Authority and that both were passed without amendment. The 1947 amendment added this language: "When a crime, punishable by imprisonment in the state prison, is also punishable by fine or imprisonment in a county jail, in the discretion of the court, it shall be deemed a misdemeanor for all purposes after a judgment other than imprisonment in the state prison, unless the court commits the defendant to the California Youth Authority. Where a court commits a defendant to the California Youth Authority upon conviction of a crime punishable by imprisonment in the state prison or fine or imprisonment in a county jail, in the discretion of the court, the crime shall be deemed a felony until and unless the court, after the person committed has been discharged from control by the California Youth Authority, and only if he was not placed in a state prison by the authority during the period of such control, on application of the person so committed and discharged, makes an order determining that the crime of which he was convicted was a misdemeanor." Navarro's conviction was in 1958 and this amendment was not then in effect.

[15]As amended in 1969 it now provides in subdivision (d), "was granted probation and probation is revoked or terminated." Other changes not here pertinent have been made in section 1731.5.

[16]Chapter 1 is entitled "The Judgment" (§ 1191 et seq.). It includes provisions for pronouncement of judgment; the time within which sentence must be imposed (§§ 1191-1202); the authority to grant probation either upon suspension of imposition of sentence or upon suspension of execution of sentence (§ 1203 et seq.); and the authority to revoke, modify or terminate at any time during the period of probation the court's order of suspension or execution of sentence (§ 1203.3).

in *In re Herrera* (1943) 23 Cal.2d 206, 214 [143 P.2d 345], that a commitment to the Youth Authority is a "judicial determination of the fact of defendant's conviction *and a pronouncement of the sentence for the offense* . . . ." (Italics added.) Commitments to the authority based on optional sentence offenses were considered to be misdemeanors in the light of section 17 of the Penal Code and the provisions of the Youth Authority Act in 1944 (4 Ops.Cal.Atty.Gen. 25). There was no change in the wording of section 17 of the Penal Code or section 1737.5 of the Welfare and Institutions Code at the time of Navarro's commitment in 1958.

In 1945 this court decided *People* v. *Williams,* 27 Cal.2d 220 [163 P.2d 692]. The case did not involve a commitment to the California Youth Authority but has been relied upon by some of the Courts of Appeal in deciding the effect of section 17 of the Penal Code upon such commitments. Williams was committed on *May 16, 1941,* to the Preston School of Industry based upon conviction of an optional sentence offense. The Preston School of Industry was then a state reform school operated by the Department of Institutions. The Youth Authority Act did not become effective until *September 13, 1941* (Stats. 1941, p. 2522) and it was not until 1943 that control of the state reform schools was transferred to the authority. (Stats. 1943, p. 2021.) The commitment of Williams was made by the superior court under a law which authorized criminal proceedings to be suspended after conviction, pronouncement of sentence to be suspended, and commitment to be made to the custody of the Preston School for reformation and rehabilitation. The court retained jurisdiction to recall the commitment at any time during the minority of the youthful offender and, upon recall, to impose a judgment upon him for the offense of which he had been convicted. (Preston School of Industry Act, Stats. 1921, p. 868, amending Stats. 1889, p. 100.)[17] One of the issues before the court in *People* v. *Williams, supra,* 27 Cal.2d 220, was whether the conviction of Williams for an optional sentence offense constituted a felony for impeachment purposes after his commitment to the Preston School. The *Williams* court held that it did; that pronouncement of sentence had been suspended; that the court could, upon just cause, recall its order of commitment to the Preston School and then impose a state prison sentence, and that the commitment did not modify the felony status of the defendant. This remained unchanged until the court exercised its sentencing discretion.

It is clear that under the law the commitment in *Williams* was not a

---

[17]The juvenile court was authorized at that time to make commitments to the Preston School, to recall its commitments, and, if the ward was returned as incorrigible, to sit as a committing magistrate and determine if probable cause existed to hold him to answer to the superior court. (Stats. 1915, p. 1225; see Stats. 1909, p. 213.)

judgment imposing a sentence. It was more comparable to a grant of probation after suspension of pronouncement of sentence—i.e., no sentence would have to be pronounced if the school term were successfully completed. Indeed, as hereinafter more fully discussed, the law provided for dismissal of the accusation and the pending action upon honorable discharge of persons committed to the Preston School.[18]

In 1963 the Court of Appeal in *People* v. *Zaccaria,* 216 Cal.App.2d 787 [31 Cal.Rptr. 383], was considering the effect of section 17 of the Penal Code upon a commitment to the authority in June 1958 (the same month and year as Navarro) upon conviction of an optional sentence offense. The court properly refused to apply the 1959 amendment to section 17 retroactively. However, it erroneously rejected defendant's contention that a commitment to the Youth Authority was different from the commitment to the Preston School considered in *Williams.* It relied instead on language in *Williams* to hold that the commitment to the authority did not impose penal punishment; found it immaterial that the committing court could not recall the commitment to the authority; and held that the original felony status of the offense was unchanged by such commitment. Without further analysis it held that "[H]ad the Legislature in 1957 intended to reduce all alternatively punishable crimes to misdemeanors on commitment to the Youth Authority, it would have said so. When the Legislature did decide to do so, in 1959, it expressed its purpose clearly." (*Id.,* p. 792.) *Zaccaria* did not mention section 1737.5 nor *In re Herrera, supra,* 23 Cal.2d 206, 214.

In 1968 the Court of Appeal in *People* v. *Palacios,* 261 Cal.App.2d 566 [68 Cal.Rptr.137], further perpetuated this misconception of legislative intent. In considering a 1962 commitment to the authority, it correctly rejected the contention that upon commitment to the authority crimes punishable *only* as felonies were reduced to a misdemeanor. In rejecting the argument that one commited to the authority has had punishment "other than" a prison sentence imposed it commented (at p. 575) that this "was dealt with in *People* v. *Williams* . . . which held that commitment to the Youth Authority [*sic*] of a person convicted of a crime was not punishment and that one committed there for a crime punishable by imprisonment, as the law stood then, remained convicted of a felony for purposes of impeachment as a witness. The crime there involved was one punishable by imprisonment or jail sentence. *People* v. *Zaccaria,* 216 Cal. App.2d 787 . . . , is to the same effect."

*People* v. *Gotham* (1960) 185 Cal.App.2d 47, 55 [8 Cal.Rptr. 20], involving a 1952 commitment to the authority (when the 1947 amendment

---

[18]See *post,* pages 271-278.

to section 17 of the Penal Code was in effect, requiring specific steps to be taken to reduce the offense to a misdemeanor after commitment to the authority) also cites *Williams* regarding commitments to the authority. In 1958 the California Attorney General, responding to an inquiry from the Director of the Youth Authority (31 Ops.Cal.Atty.Gen. 200) advised that where the sentencing court has the alternative of committing a convicted person either to prison or to the Youth Authority "and the court commits the person to the Youth Authority, this commitment is not one for a misdemeanor in all cases," without further amplification except to note the *Williams* decision (and cases cited therein) and its holding that a commitment to the Preston School did not impose a "punishment" but was to reform and retrieve the offender. The opinion did not refer to *Herrera* nor to section 1737.5 nor distinguish between the type of commitment involved in *Williams* and under the Youth Authority Act.

The retroactive effect of the 1959 amendment to section 17 of the Penal Code was considered in *People* v. *Aranda* (1965) 63 Cal.2d 518, 531-532 [47 Cal.Rptr. 353, 407 P.2d 265], and in *People* v. *Ramsey* (1962) 202 Cal.App.2d 856, 859 [21 Cal.Rptr. 406], and was rejected.[19] It is important to note that in each of those cases the commitment to the authority was made during the period 1947-1957; that neither of the persons involved had applied after discharge from the authority for a court order reducing the crime to a misdemeanor; and the statute was construed as not indicating a legislative intent to extend the clemency provisions of the 1959 amendment to ameliorate the restrictive requirements of the 1947 amendment. It does not necessarily follow, however, that the legislative intent in enacting the 1959 amendment was different from its intent in enacting section 17 as it read in 1941 at the time of the creation of the Youth Authority, and in 1958 at the time of Navarro's conviction. It could reasonably be held that in 1959 the Legislature intended to settle by more specific language the status of a commitment to the authority based upon an alternative sentence offense, and it was not a change in policy.

In *People* v. *Hannon* (1971) 5 Cal.3d 330 [96 Cal.Rptr. 35, 486 P.2d 1235], this court had for consideration the effect of the 1959 amendment to section 17 of the Penal Code upon a *1968* commitment to the authority based upon an optional sentence offense. The contention there raised was that the 1959 amendment made such offenses misdemeanors only conditionally, so that if the person committed was thereafter returned to court by the authority pursuant to section 1737.1, he could then be sentenced as a felon. We rejected that contention, holding that under the statute the offense was a misdemeanor thereafter "for all purposes." In emphasizing the prin-

---

[19]No part of a statute is retroactive unless expressly so declared. (Pen. Code, § 3.) Section 17 does not declare a retroactive intent.

ciple that the Legislature is capable of precisely delineating its intent in this area, that it had made such delineation and that there were no implied conditions to be read into section 17, the opinion cited *Williams, Zaccaria, Ramsey* and *Palacios, supra*. The court was not there considering the effect of the 1958 wording of section 17 upon commitments to the authority based upon optional sentence offenses.

■ To avoid any ambiguity or further misconception we hereby reaffirm the holding of this court in *In re Herrera, supra*, 23 Cal.2d 206, 214 [143 P.2d 345], that a commitment to the authority is a pronouncement of the sentence for the offense. ■ We hereby hold that a commitment to the authority based upon conviction of an optional sentence offense reduced that offense unconditionally to a misdemeanor, for all purposes thereafter, except during the years when the 1947 amendment was in effect.[20] ■ Accordingly, because of Navarro's commitment to the Youth Authority his 1958 conviction of assault with a deadly weapon constituted a misdemeanor and did not render him ineligible for the narcotics addict treatment program under section 3052.

■ Three: (a) *Did Navarro's honorable discharge from the Youth Authority pursuant to section 1772 result in automatic statutory release of "penalties and disabilities" resulting from the offense for which he was committed? (b) If so, do these "penalties and disabilities" include release from the ineligibility provisions of section 3052?*

While disposition of this issue could be avoided and the appeal determined on the grounds hereinabove considered, it raises a question which is not only squarely presented on the record but is of significant importance to those persons who have received a certificate of honorable discharge from the Youth Authority. It is proper that we consider it. We answer each question in the affirmative.

Section 1772 has been amended only once, in 1949. It reads, with the amendments underscored: "Every person honorably discharged from control by the authority who has not, during the period of control by the authority, been placed by the authority in a state prison shall thereafter be released from all penalties and disabilities resulting from the offense or crime for which he was committed, and every person discharged may

---

[20]Any expressions to the contrary in *People v. Zaccaria*, 216 Cal.App.2d 787 [31 Cal.Rptr. 383], *People v. Palacios*, 261 Cal.App.2d 566 [68 Cal.Rptr. 137], and *People v. Ramsey*, 202 Cal.App.2d 856 [21 Cal.Rptr. 406], are hereby disapproved, and no implication that we agree therewith should be drawn from our citation of those decisions in *People v. Hannon*, 5 Cal.3d 330 [96 Cal.Rptr. 35, 486 P.2d 1235].

petition the court which committed him, and the court may upon such petition set aside the verdict of guilty and dismiss the accusation or information against the petitioner who shall thereafter be released from all penalties and disabilities resulting from the offense or crime for which he was committed. [Paragraph] Every person discharged from control by the authority shall be informed of this privilege in writing at the time of discharge.[21] [Paragraph] 'Honorably discharged' as used in this section means and includes every person whose discharge is based upon a good record on parole."

The official records indicate that Navarro's discharge was based upon a good record on parole and that he had not been placed in a state prison during the period of control by the Youth Authority. He therefore argues that he was statutorily and automatically released from "all penalties and disabilities resulting from the offense or crime for which he was committed. . . ." The Attorney General takes the position that all persons discharged, including those honorably discharged, must first file a petition with the committing court as indicated by the second part of the first sentence of the first paragraph of section 1772. It is conceded that Navarro has not filed such a petition.

There is some ambiguity in section 1772 but little case law on its meaning. In *Parks* v. *Superior Court* (1971) 19 Cal.App.3d 188 [96 Cal.Rptr. 645], it was held that the first part of the first sentence creates a substantive right in persons honorably discharged by the Youth Authority to obtain the relief conferred, that the committing court has no discretion to refuse to grant such relief, and that it cannot deny this relief by reason of behavior subsequent to such discharge. We quote with approval the statement appearing on page 192: "The section particularly as amended in 1949 is 'incentive' legislation. 'Honorable discharge' means more than just any release. It is a prize for good behavior, and it is won when the honorable discharge takes place. To say that the Legislature intended to hold out the apple and then withdraw it (in the discretion of the judge) for some future act is more than just to disclaim the rules of construction of statutes we have stated above. It is to frustrate the obvious purpose of a law designed to rehabilitate delinquent youths by extending to them parole with a goal at which to aim, together with the assurance that when that goal has been reached a real 'head start' would be guaranteed. [Paragraph] Unfortunately not every person 'honorably discharged,' released from parole and restored to society will stay out of trouble. Obviously this youth did not.

---

[21]The discharge certificate issued by the Youth Authority shows on its face whether it is an "honorable" discharge; on the reverse side appear the provisions of sections 1772 and 1179, without comment or explanation.

*We construe a statute. We hold it contemplated as regards 'honorably discharged' persons a right conferred by fulfillment of the condition specified with court action only evidencing the right already granted."* (Italics added.)

The procedural issue[22] was not presented in *Parks*. There the petitioner had filed for section 1772 relief and had been denied. The reviewing court held that action by the committing court thereafter was only a procedural step, and commented that legislative failure to amend the latter portion of the first paragraph may represent recognition of the procedural routine or may instead have resulted from inadvertence. We believe that it resulted from inadvertence.

A statute must be construed in light of the legislative purpose and design (*People* v. *Grubb* (1965) 63 Cal.2d 614, 620 [47 Cal.Rptr. 772, 408 P.2d 100]). In enforcing command of a statute, both the policy expressed in its terms and object implicit in its history and background should be recognized. (*Reimel* v. *Alcoholic Bev. etc. App. Bd.* (1968) 263 Cal. App.2d 706 [69 Cal.Rptr. 744].) Consideration may be given to chapter and section headings in codes in interpreting the various sections. (*Gonzales* v. *Superior Court* (1935) 3 Cal.2d 260, 263 [44 P.2d 320].) Consideration may also be given to other statutes *in pari materia* (*County of Los Angeles* v. *Frisbie* (1942) 19 Cal.2d 634, 639 [122 P.2d 526]).

Section 1772 is contained in division 2.5, "Youths" (§ 1700 et seq.) in article 4, "Powers and Duties of the Youth Authority," of the Welfare and Institutions Code. Division 2.5 contains only chapter one. Division 2, "Children," contains in chapter 2 thereof the Juvenile Court Law (§ 500 et seq.) and in chapter 3, "Institutions for Delinquents" (§ 1000 et seq.). The latter refers to institutions operated by the Youth Authority "for the

---

[22]*Adams* v. *United States* (9th Cir. 1962) 299 F.2d 327, 331-332, in considering the question whether an honorable discharge from the California Youth Authority released Adams from a federal statutory provision which required registration of any United States citizen convicted of a narcotics offense before departing from or entering into this country (18 U.S.C. § 1407), held that the statute did not create a "penalty," and in any event Adams had not applied for an order from California setting aside his conviction pursuant to section 1772. This was not only dictum but was based on the misconception that section 1772 was comparable to section 1203.4 of the Penal Code, and only the latter states that the person affected must apply to the court for the relief in question. Other federal cases dealing with section 1772 may be distinguished on the grounds that they involved the effect of a California statute upon an act of Congress. (*Garcia-Gonzales* v. *Immigration & Nat. Serv.* (9th Cir. 1965) 344 F.2d 804, 807-809, cert. den. 382 U.S. 840 [15 L.Ed.2d 81, 86 S.Ct. 88]; *de la Cruz-Martinez* v. *Immigration & Naturalization Service* (9th Cir. 1968) 404 F.2d 1198, 1199-1200, cert. den. 394 U.S. 955 [22 L.Ed.2d 491, 89 S.Ct. 1291].) The California Legislature has no power to overrule an act of Congress. Section 17 of the Penal Code applies only to crimes under state statutes. (*Caminetti* v. *Imperial Mut. L. Ins. Co.* (1943) 59 Cal.App.2d 476 [39 P.2d 681].)

reception of wards of the juvenile court and other persons committed to the department." "Other persons" necessarily includes commitments made by trial courts based on criminal convictions, pursuant to sections 1736 and 1731.5. No other agencies are authorized to make commitments to the Youth Authority. ▇ The provisions of divisions 2 and 2.5 necessarily overlap and must be considered together.

A provision somewhat similar to section 1772 (Youth Authority Act) is contained in section 1179 (Institutions for Delinquents operated by the Youth Authority). It reads: *"All persons honorably dismissed* from any such school and all persons who are retained at any such school for the full period of their respective commitments *shall thereafter be released from all penalties or disabilities resulting from the offenses for which they were committed.* Upon the final discharge or dismissal of any such person, the Youth Authority shall immediately certify such discharge or dismissal in writing, and shall transmit the certificate to the court by which the person was committed. The court shall thereupon dismiss the accusation and the action pending against such person." (Italics added.)

Section 1179, like section 1772, confers an absolute right, where and as soon as honorable dismissal or discharge has occurred, upon persons affected to be released "from all penalties or disabilities resulting from the offenses for which they were committed." In addition it contains mandatory language directing the Youth Authority upon such final discharge or dismissal to "immediately certify such discharge or dismissal in writing" and to "transmit the certificate to the court by which the person was committed." The court is required to "thereupon dismiss the accusation and the action pending against such person." No clearer language could have been used to express the legislative intent as to section 1179.

It is necessary to review the history of section 1179 in order to determine the meaning of the language used and to consider this and other relevant statutes in order to ascertain their meaning.

It is apparently the interpretation of the Youth Authority that section 1179 applies only to juvenile court commitments and section 1772 applies only to criminal court commitments. (See Baum, *Wiping Out a Criminal or Juvenile Court Record* (1965) 40 State Bar J. 816, 821.) ▇ While administrative constructions are entitled to great weight when the language of a statute is ambiguous, final responsibility for the interpretation of the law rests with the court and an erroneous administrative construction does not govern the interpretation of the statute, even though the statute is subsequently reenacted without a change. (*Whitcomb Hotel, Inc.* v. *Cal. Emp. Com.* (1944) 24 Cal.2d 753, 757-758 [151 P.2d 233, 155 A.L.R. 405].)

There is some ambiguity caused by the language in section 1179 (i.e., reference to "any such school") which can be resolved only by review of prior legislation on which this section is based, and by review of other provisions of chapter 3 "Institutions for Delinquents" in division 2 and those of chapter 1, division 2.5. While the relief provisions of sections 1179 and 1772 are somewhat unique in this country they have had a long history in this state.[23]

In 1889 the Legislature authorized the establishment of the Preston School of Industry at Ione under the control of the State Board of Prison Directors (Stats. 1889, p. 100), and of a State Reform School for boys and girls at Whittier (Stats. 1889, p. 111). In 1913 the girls were transferred to the newly established California School for Girls (Stats. 1913, p. 857) later designated the Ventura School for Girls (Stats. 1925, p. 548), now the Ventura School for girls and boys located in Camarillo.

The 1889 statute provided that when any magistrate or court of competent jurisdiction found any boy under the age of 18 years guilty of any offense punishable by fine or imprisonment, it could, in its discretion, suspend judgment or sentence, except when the penalty was life imprisonment or death, and commit such boy to Preston for a period of time not exceeding his 21st birthday. The board was required to make rules reducing the time for which he was committed as a reward for good conduct, and whenever it deemed him "to have been so far reformed as to justify his discharge, to give him an *honorable dismissal,* and to cause an entry of the reasons for such dismissal to be made in the book of records prepared for that purpose. *All persons thus honorably dismissed, and all those who shall have served the full term of their respective sentences, shall thereafter be released from all penalties and disabilities resulting from the offenses or crimes for which they were committed. Upon the final discharge of any inmate . . . the Superintendent shall immediately certify such discharge in writing, and shall transmit the certificate to the magistrate or Court by which such . . . boy was committed. Said magistrate or Court shall thereupon dismiss the accusation and the action pending against said person."* (Italics added.) The source of the identical language in section 1179 is apparent.

---

[23]In 1909 the first of the release provisions in the Penal Code was enacted, now section 1203.4; subsequently sections 1203.4a and 1203.45 were enacted, providing for release from penalties and disabilities resulting from the offense for which commitment was made.

Comment in 2 Stanford Law Review 221, views section 1203.4 as "without parallel in legislation of any other state, carries rehabilitation another step forward, for it contemplates releasing the successful probationer from all the 'penalties and disabilities' resulting from the conviction. Once having proved his ability and desire to abide by the law, the probationer is afforded an opportunity to erase the legal consequences normally incident to a conviction."

The 1889 statute also authorized the board to issue a certificate of conditional dismissal and parole upon conditions which included indenture to a suitable person to educate and instruct the minor in any suitable art or trade. Any boy who violated parole could be returned to the school to serve the unexpired term of his sentence, and if he had been received from either of the state prisons he could be returned thence. However, it provided that "Every paroled boy who properly observes and obeys the condition of his parole until the date of the expiration of his time of commitment, shall be entitled to all the benefits and immunities in this Act provided." Automatic release from penalties was thus extended to persons honorably dismissed from the school (apparently for good conduct prior to expiration of commitment), to those who remained and served their full sentence at the school, and to those who went on parole, fulfilled the conditions thereof and were discharged prior to or at expiration of commitment. The administration and the courts were required to take the procedural steps necessary to carry out this legislative clemency. In 1921 (Stats. 1921, p. 883), the act was amended to provide for parole and honorable dismissal from the school when the boy had proved his ability for self-support.

Similar provisions were made with regard to the Whittier and Ventura schools. These provisions were in effect in California 10 years before the first Juvenile Court was established in this country (1899, Illinois); 20 years before the first Juvenile Court Act in California (1909), 20 years before the clemency provisions in the Penal Code (1909); and over 50 years before the institutions in question were transferred to the Youth Authority (1943). California was the first state to adopt the Youth Authority concept, proposed by the American Law Institute in its 1940 Model Youth Correction Authority Act. That act contemplated (§ 29) that "The Authority shall discharge [persons committed to it] as soon as in its opinion there is reasonable probability that he can be given full liberty without danger to the public." However, it made no provision for "honorable" discharge and provided no inducements or rewards other than the training received and the fact of discharge.

Looking back at prior legislation we note also that in 1903 (Stats. 1903, p. 44) provision was made for the treatment of dependent and delinquent children, providing probation officers[24] for their supervision and requiring segregation of children from adults when placed in jails or prisons. This was amended in 1905 to allow commitments of such children to be made to the Whittier school; and in 1907 amended to allow them to be commited

---

[24]The history of parole for adult offenders in California goes back to the legislation establishing the indeterminate sentence in 1917. (MacGregor, *Probation, Parole, and Pardon in California* (1960) 38 Texas L. Rev. 887, 901.)

to any of the state reform schools. The 1889 acts, as amended, were not affected by this legislation. In 1909 (Stats. 1909, p. 226) a Juvenile Court Act was adopted (repealed and new act adopted in 1915 [Stats. 1915, p. 1225]) which specifically superseded, regarding commitments, the provisions of the act of 1889 but left all matters concerning management of the schools as provided in the 1889 act. Commitments could be made to Preston by "any competent court" (Preston School of Industry Act, Stats. 1921, p. 881; amending § 23 of Stats. 1889, p. 100, to delete another sentence not here pertinent), as well as by the juvenile court.

The phrase "any such school" in section 1179 relates to not only the three pre-existing schools but to those thereafter established and maintained by the Youth Authority (§ 1000). The original schools had always received commitments based on criminal convictions, albeit by suspended sentence. Later they were authorized to receive juvenile court commitments. The Youth Authority was authorized to place any of its wards, juvenile court or otherwise, in any of its institutions. It cannot be concluded that section 1179, or the other provisions of chapter 3 of division 2, were intended to apply only to juvenile court wards. The interdependency of the provisions of that chapter and those in chapter 1 of division 2.5 is obvious.

Sections 1179 and 1772 clearly reflect a legislative policy enunciated almost 100 years ago to provide incentives to youthful offenders to work towards honorable dismissal or honorable discharge. � It is a fair interpretation of section 1772 that the 1949 amendment thereto, defining "honorable discharge" and adding the first part of the first sentence relating to persons "honorably discharged" was intended to provide by statute the automatic release from "all penalties and disabilities resulting from the crime or offense for which he was committed" provided by section 1179. Responsibility was placed upon the Youth Authority and the courts to comply with the mandate of section 1179 as to persons honorably discharged pursuant to both sections 1179 and 1772.

Other differences in language in the two sections are not of particular significance in this regard. Section 1179 provides for dismissal of the accusation and the action pending against such person; section 1772 provides for setting aside the plea or verdict of guilty and dismissal of the accusation or information. Section 1179 provides for release from penalties and disabilities resulting from "the offense" for which he was committed; section 1772 for those resulting from "the offense or crime" for which he was committed. It is noted that section 1203.4, Penal Code, uses the same language as in section 1179, namely release from penalties and disabilities resulting from "the offense."

■ We therefore conclude that upon receiving his certificate of honorable discharge Navarro was entitled as a matter of right to have the Youth Authority and the committing court take the procedural steps required by sections 1179 and 1772. If a *pro forma* release is required as documentary evidence he is entitled to this as of right and may apply for a *nunc pro tunc* order of dismissal which the committing court has no discretion to refuse. The same relief is available to other persons in the class of Navarro, i.e., those receiving an honorable discharge from the Youth Authority. Somewhat similar but not identical relief is provided in Penal Code sections 1203.4, 1203.4a, and 1203.45 which specify that the person affected must apply to the court for such relief. In section 1772 the phrase reading "and every person discharged *may* petition the court which committed him, and the court *may upon such petition* set aside the verdict of guilty and dismiss the accusation or information against the petitioner who shall *thereafter* be released from all penalties and disabilities resulting from the offense or crime for which he was committed," (italics added) confers discretionary power upon the court to grant this relief on such showing as to the court seems satisfactory, after application by the person who did not receive an "honorable" discharge.

(b) *The penalties and disabilities released include the exclusionary provisions of section 3052.*

The Legislature has not defined what "penalties and disabilities" it intended to release pursuant to the expungement provisions of sections 1179 and 1772. (See *Kelly* v. *Municipal Court* (1958) 160 Cal.App.2d 38, 41-42 [324 P.2d 990]; *People* v. *Mackey* (1922) 58 Cal.App. 123, 130 [208 P. 135].) It has defined some disabilities it did not intend to release by amendments to sections 1203.4, 1203.4a and 1203.45 of the Penal Code, and to the licensing provisions of other codes. It has modified the mandatory exclusions applicable to persons with felony convictions in section 3052 of the Welfare and Institutions Code and in section 1029 of the Government Code.[25] It has specifically stated some, but not all of the rights restored upon the granting by the Governor of a full and unconditional pardon based upon a certificate of rehabilitation and upon a full pardon (Pen. Code, §§ 4852.17, 4853).[26]

---

[25]Government Code section 1029 disqualifies any ex-felon from being employed as a peace officer in this state; in 1971 subdivision (b) was added to provide that a person who has been convicted of a felony other than a felony punishable by death, and who demonstrates the ability to assist persons in programs of rehabilitation may be employed as a parole officer if he has been granted a full and unconditional pardon for the felony of which he was convicted.

[26]See MacGregor, *supra*, 38 Texas Law Review 888, 907 et seq. as to background history of Penal Code section 4852.01, Procedure for Restoration of Rights and Application for Pardon.

In sections 1203.4 and 1203.4a of the Penal Code the Legislature specifically provided that after such relief is granted the prior conviction may be pleaded and proved in any subsequent prosecution of the defendant for another offense and shall have the same effect as if such relief had not been granted. It appears to be significant that this provision was not included in sections 1179 and 1772 of the Welfare and Institutions Code. It is also noted that these sections contain no provision for sealing of records such as provided in section 1203.45 of the Penal Code and section 781 of the Welfare and Institutions Code.

Very few states have enacted expungement legislation. In 1950 the Federal Youth Offender Act (18 U.S.C.A. § 5005) was adopted, partly upon the basis of the California Youth Authority experience (see 1950 U.S. Code Cong. & Admin. News, pp. 3983, 3989). This act provides for the issuance of an order setting aside the conviction automatically upon unconditional discharge of a Youth Offender before expiration of his sentence or probation (§ 5021). This "expunges" the conviction. (*Tatum* v. *United States* (1962) 310 F.2d 854 [114 App.D.C. 49]; see also *People* v. *Robinson* (1969) 1 Cal.App.3d 555 [81 Cal.Rptr. 666]; *In re Ringnalda* (S.D. Cal. 1943) 48 F.Supp. 975.)

The direct and collateral consequences of a criminal conviction are becoming matters of increasing public concern.[27] "The legal situation, confusing even to the trained lawyer, is generally quite beyond the understanding of the convicted offender who ordinarily is not advised as to the disabilities and disqualifications accompanying his conviction, nor as to any procedures which may be available for their removal. Such complexity and confusion would seem to detract from whatever deterrent function disabilities might serve. Similarly, restoration procedures cannot accomplish their purpose if convicted offenders are unaware of their availability" (Task Force Report: Corrections, p. 89).[28] The present trend is towards increasing number of applications for "expungement" relief. There appears to be a need for clarification of procedural and substantive rights.

The courts, in those few "expungement" cases that have come before

---

[27]See Gough, *The Expungement of Adjudication Records: A Problem of Status* (1966) Washington University Law Quarterly 147, 174; Pettler & Hilman, *Criminal Records of Arrest and Conviction: Expungement from the General Public Areas* (1967) 3 California Western Law Review 121; *The Expungement Myth* (1963) 38 Los Angeles Bar Bulletin 161; Note, *The Effect of Expungement on a Criminal Conviction* (1967) 40 Southern California Law Review 127, 132; Baum, *Wiping Out a Criminal or Juvenile Record, supra,* 40 State Bar Journal 816.

[28]The President's Commission on Law Enforcement and Administration of Justice (1967) Task Force Report: Corrections, Collateral Consequences of a Criminal Conviction, pages 88-92.

them, have generally construed the phrase "penalties and disabilities" to refer to criminal or quasi-criminal penalties imposed for punishment or prevention of crime, and to have examined the seeming conflict between different statutes by analysis of the policies which each statute was designed to effectuate. (See *Kelly* v. *Municipal Court, supra,* 160 Cal.App.2d 38, 42, 45.)

It is inappropriate to attempt to here define all the penalties and disabilities intended to be released by section 1772, or its counterpart section 1179. (See 17 Ops.Cal.Atty.Gen. 34 (1951); 32 Ops.Cal.Atty.Gen. 43 (1958) and his analysis of some of them.) We are concerned here with the specific question whether exclusion from the narcotic addicts treatment program is a "penalty or disability" resulting from a prior conviction which is released as to those persons receiving honorable discharge from the Youth Authority or as to those persons who did not receive an honorable discharge but subsequently applied to the court pursuant to section 1772 and obtained such relief. We decide this question categorically. As an individual addict, Navarro could be considered by the sentencing court herein, in its discretion, pursuant to section 3051 which allows it to make such commitments notwithstanding section 3052. We are concerned with the category or class into which he fits, to determine whether it composes a class of addicts which comes within the mandatory provisions of section 3051 because it has been released by an expungement statute from the exclusionary provisions of section 3052.

To state the question is almost to answer it. Addicts in the class of Navarro are eligible for probation, prison sentence or commitment to the treatment program at the California Rehabilitation Center. The court refused his request for probation. The remaining sentence alternatives, state prison versus the treatment program, have different program and parole opportunities and time consequences. *But for* a prior conviction of an offense named in section 3052, persons in this class must be committed to the treatment program. It would clearly appear to be a "criminal" penalty arising from a prior criminal conviction which affects a present criminal sentence. We reject the Attorney General's contention that commitment to the treatment program is not a releasable disability under the expungement statutes. We do note, however, that retention in the treatment program is a matter within the final decision and discretion of the Director of Corrections. (§ 3053.)

Looking at the legislative purpose in the enactment of sections 1772 and 3052 we find the same general purpose, *protection of the public.* The Youth Authority Act was enacted to protect society more effectively by substituting for retributive punishment methods of training and treatment

directed toward the correction and rehabilitation of young persons found guilty of public offenses (§ 1700). The narcotic addicts act was enacted to carry out nonpunitive treatment of addicts and of those in imminent danger of becoming addicts, not only for their own protection and treatment but for the prevention of contamination of others (§ 3000). While on the streets addicts tend to influence others to use, to buy or to sell narcotics, and the legislation was designed not only to treat them for addiction but to protect the public by the policies, program and parole provisions of the narcotic addicts act.

A public-protective purpose may be served by excluding from the treatment program persons convicted of the offenses enumerated in section 3052—the legislative presumption being that those persons would either not benefit by the program or might hamper the integrity of the program for other persons. This legislative presumption was commendably relaxed by the amendment to section 3051 allowing exceptions notwithstanding section 3052. It would appear to be also within the legislative presumption that persons who are entitled to release of penalties and disabilities arising from their prior conviction are persons entitled to be released from the exclusions stated in section 3052. Among the strong goals set for Youth Authority wards by the Legislature are receiving trade training and work furloughs, so that they may become honorably self-employed (§§ 1122, 1123, 1176, 1177, 1830), released on parole under supervision to assist in this goal, and discharged from parole when discharge is consistent with the protection of the public (§ 1766). Section 1772, as noted above, is "incentive" legislation. To apply it as releasing persons affected by it from the exclusions of section 3052, would appear to be within the public-protective purposes of the Legislature and not otherwise denied by statute.

We therefore hold that the penalties and disabilities released pursuant to section 1772 of the Welfare and Institutions Code include release from the exclusionary provisions of section 3052.

The proceedings are remanded to the court below for resentencing pursuant to the mandatory provisions of section 3051.

Wright, C. J., Peters, J., Mosk, J., Burke, J., and Sullivan, J., concurred.