# IN THE SUPREME COURT OF CALIFORNIA

JESSICA MILLAN PATTERSON et al.,
Petitioners,

v.

ALEX PADILLA,
as Secretary of State, etc.,
Respondent.

S257302

---

November 21, 2019

Chief Justice Cantil-Sakauye authored the opinion of the Court, in which Justices Chin, Corrigan, Liu, Cuéllar, Kruger and Groban concurred.

Justice Cuéllar filed a concurring opinion.

---

PATTERSON v. PADILLA
S257302


Opinion of the Court by Cantil-Sakauye, C. J.


We must decide in this case whether portions of the recently enacted Presidential Tax Transparency and Accountability Act (Elec. Code, § 6880 et seq.) (the Act) conflict with article II, section 5, subdivision (c) of the California Constitution (article II, section 5(c)) and are therefore invalid. At issue are the Act's provisions that prohibit the Secretary of State from printing on a primary election ballot the name of a candidate for President of the United States who has not filed with the Secretary of State the candidate's federal income tax returns for the five most recent taxable years. Because of the important and time-sensitive nature of this controversy, we have exercised our original jurisdiction to entertain an emergency petition for a writ of mandate that would forbid the Secretary of State from enforcing the pertinent sections of the Act. Upon issuing an order to show cause, we directed the parties to submit briefing on an expedited basis to ensure the matter would be decided ahead of the November 26, 2019 statutory deadline for candidates to disclose their tax returns to appear on the March 3, 2020 primary ballot.[1]

---

[1] Several lawsuits pending in federal court assert that the provisions of the Act that are at issue here also violate federal law. Last month, the United States District Court for the Eastern District of California issued an order granting the federal plaintiffs' request for a preliminary injunction that

The dispute before us turns on the interpretation of article II, section 5(c), which states: "The Legislature shall provide for partisan elections for presidential candidates, and political party and party central committees, *including an open presidential primary whereby the candidates on the ballot are those found by the Secretary of State to be recognized candidates throughout the nation or throughout California for the office of President of the United States*, and those whose names are placed on the ballot by petition, but excluding any candidate who has withdrawn by filing an affidavit of noncandidacy." (Italics added.)

In requesting a writ of mandate, petitioners Jessica Millan Patterson and the California Republican Party (petitioners) assert that article II, section 5(c) requires a presidential primary

---

prohibits the Secretary of State from enforcing these provisions. (*Griffin v. Padilla* (E.D.Cal., Oct. 2, 2019, No. 2:19-cv-01477-MCE-DB, No. 2:19-cv-01501-MCE-DB, No. 2:19-cv-01506-MCE-DB, No. 2:19-cv-01507-MCE-DB, No. 2:19-cv-01659-MCE-DB) __ F.Supp.3d __, __ [2019 WL 4863447, p. *1].) In so ruling, the federal court determined that the federal plaintiffs were likely to demonstrate that the challenged sections of the Elections Code violate the qualifications clause of the United States Constitution (U.S. Const., art. II, § 1, cl. 5), the First Amendment to the United States Constitution, and the equal protection clause of the Fourteenth Amendment to the United States Constitution; and that the provisions of the Act are preempted by the Ethics in Government Act of 1978 (5 U.S.C.A. Appen. 4, § 101 et seq). (*Griffin*, at p. __ [2019 WL 4863447, pp. *8, *10, *11, *12].) The Secretary of State has appealed this ruling to the United States Court of Appeals for the Ninth Circuit.

No federal claims are raised in the present case; petitioners' sole argument is that the Act conflicts with article II, section 5(c).

in which the names of all "recognized candidates throughout the nation or throughout California for the office of President of the United States" appear on the ballot. Petitioners cast the Act as unconstitutional because it imposes an additional disclosure requirement for appearing on a presidential primary ballot. In petitioners' view, this additional prerequisite undermines the primary process contemplated by article II, section 5(c), and cannot lawfully be enforced.

Secretary of State Alex Padilla, named as respondent, counters that article II, section 5(c) does not prevent the Legislature from prescribing disclosure prerequisites that even "recognized candidates throughout the nation or throughout California for the office of President of the United States" must satisfy if they are to appear on a presidential primary ballot. In respondent's view, by stating that "[t]he Legislature shall provide for . . . an open presidential primary," article II, section 5(c) confirms that branch's long-recognized, expansive authority to devise reasonable rules for primary elections, including presidential primaries. And subsumed within this power, respondent argues, is the authority to enact neutral disclosure laws that provide relevant information to voters and thus enable the electorate to make a more informed choice among presidential candidates.

Upon careful consideration of the parties' briefing and arguments, as well as the submission by amicus curiae, we conclude that petitioners are entitled to a writ of mandate. We direct the Secretary of State to refrain from enforcing Elections Code sections 6883 and 6884, the relevant provisions of the Act, insofar as enforcement of these sections would keep the name of a "recognized candidate[] throughout the nation or throughout California for the office of President of the United States" from

being printed on the ballot of a political party that has qualified to participate in the primary election.

As we shall explain, article II, section 5(c) is properly read as including a requirement that all persons found to be "recognized candidates" in the relevant sense must appear on the appropriate primary ballot, except when an affidavit of noncandidacy has been filed. This interpretation reflects the most natural reading of article II, section 5(c), and it vindicates the intent behind this provision. The language within article II, section 5(c) providing for the inclusion of "recognized" candidates on the primary ballot was added to the state Constitution through a June 1972 ballot measure, Proposition 4. As the history of Proposition 4 makes clear, its purpose was to ensure that the voters at future California presidential primary elections would have the opportunity, within each qualifying political party, to choose among a complete array of candidates found to be "recognized candidates throughout the nation or throughout California for the office of President of the United States," who had not filed affidavits of noncandidacy to remove themselves from the ballot.

Elections Code sections 6883 and 6884 purport to make the appearance of a "recognized" candidate for president on a primary ballot contingent on whether the candidate has made the disclosures specified by the Act. This additional requirement, however, is in conflict with the Constitution's specification of an inclusive open presidential primary ballot. The Legislature may well be correct that a presidential candidate's income tax returns could provide California voters with important information. But article II, section 5(c) embeds in the state Constitution the principle that, ultimately, it is the voters who must decide whether the refusal of a "recognized

4

candidate[] throughout the nation or throughout California for the office of President of the United States" to make such information available to the public will have consequences at the ballot box.

We therefore issue the writ of mandate.

## I. BACKGROUND

We begin by describing the Act, and then review analyses of the measure that were prepared while it was still under consideration by the Legislature. We then discuss contemporaneous legislation that was enacted earlier this year as Senate Bill No. 505 (2019-2020 Reg. Sess.) (Senate Bill No. 505). The latter statute is not directly at issue, but it is nevertheless relevant to the dispute before the court. The last portion of this background section will relate the brief history of this writ proceeding.

### A. The Presidential Tax Transparency and Accountability Act

*1. Senate Bill No. 27*

The Assembly and the Senate passed the Act in July 2019 as Senate Bill No. 27 (2019-2020 Reg. Sess.) (Senate Bill No. 27), and the Governor signed the measure into law. As an urgency statute, the Act went into effect immediately "[i]n order to ensure that the protections" it affords "are in place for the 2020 primary election." (Stats. 2019, ch. 121, § 3.)[2]

The Act directs the Secretary of State not to print on a primary ballot the names of candidates for President of the

---

[2] The Act was not the Legislature's first attempt to enact an income tax return disclosure requirement for presidential candidates. Senate Bill No. 149 (2017-2018 Reg. Sess.),

United States or for Governor of California who have not filed their federal income tax returns with the Secretary of State. (Elec. Code, §§ 6883-6884, 8902-8903.) Because article II, section 5(c) relates only to the presidential primary ballot, only the provisions of the Act relating to candidates for president are implicated in this proceeding.

Regarding candidates for president, the Act provides, "Notwithstanding any other law, the Secretary of State shall not print the name of a candidate for President of the United States on a primary election ballot, unless the candidate, no less than 98 days before the presidential primary election, files with the Secretary of State copies of every income tax return the candidate filed with the Internal Revenue Service in the five most recent taxable years . . . ." (Elec. Code, § 6883, subd. (a).)[3] The candidate must file with the Secretary of State both unredacted and redacted versions of these returns, removing

_____

introduced in 2017, also would have required candidates for president to release their tax returns in order to be included on the primary ballot. (*Id*., as enrolled Sept. 20, 2017, § 1.) Both houses of the Legislature passed this measure, but as discussed *post*, the bill was vetoed by then-Governor Jerry Brown.

[3] The statute addresses the possibility that a candidate may not have filed federal income tax returns for all five of the most recent taxable years. It provides, "If the candidate has not filed the candidate's income tax return with the Internal Revenue Service for the tax year immediately preceding the primary election, the candidate shall submit a copy of the income tax return to the Secretary of State within five days of filing the return with the Internal Revenue Service" (Elec. Code, § 6883, subd. (b)), and, "The [disclosure] requirement . . . does not apply to any year in which the candidate was not required to file the candidate's income tax return with the Internal Revenue Service" (*id*., subd. (c)).

certain personal information such as social security numbers, home addresses, and medical information from the latter version. (*Id*., § 6884, subd. (a)(1).) The candidate also must file with the Secretary of State a signed written consent form that grants the Secretary of State permission to make a redacted version of the tax returns publicly available. (*Id*., subd. (a)(2).)

Upon receiving the income tax returns, the Secretary of State is to review them to confirm that only the information identified by statute as subject to redaction has been removed. (Elec. Code, § 6884, subd. (b).) If additional redactions have been made to a tax return, "the Secretary of State shall prepare a new version of the tax return with only the redactions permitted by" statute. (*Ibid*.) Within five days of receiving a candidate's tax returns, the Secretary of State shall make appropriately redacted versions of the returns available to the public on the Secretary's website. (*Id*., subd. (c)(1), (2).) These versions "shall be continuously posted until the official canvass for the presidential primary election is completed." (*Id*., subd. (c)(3); see also *id*., subd. (c)(4).)

The Act includes the following findings and declarations regarding the income tax return disclosure requirement for presidential candidates: "The . . . State of California has a strong interest in ensuring that its voters make informed, educated choices in the voting booth. To this end, the state has mandated that extensive amounts of information be provided to voters, including county and state voter information guides. The Legislature also finds and declares that a Presidential candidate's income tax returns provide voters with essential information regarding the candidate's potential conflicts of interest, business dealings, financial status, and charitable donations. The information in tax returns therefore helps voters

to make a more informed decision. The Legislature further finds and declares that as one of the largest centers of economic activity in the world, the State of California has a special interest in the President refraining from corrupt or self-enriching behaviors while in office. The people of California can better estimate the risks of any given Presidential candidate engaging in corruption or the appearance of corruption if they have access to candidates' tax returns. Finally, the State of California has an interest in ensuring that any violations of the Foreign Emoluments Clause of the United States Constitution or statutory prohibitions on behavior such as insider trading are detected and punished. Mandated disclosure of Presidential candidates' tax returns will enable enforcement of the laws against whichever candidate is elected President. The Legislature finds and declares that compliance costs with this requirement will be trivial." (Elec. Code, § 6881.)

### 2. Legislative History

The analyses prepared in connection with the Legislature's consideration of Senate Bill No. 27 detailed the reasoning behind the measure. A Senate floor analysis explained, "In 1973, the Providence Journal-Bulletin obtained and published data showing that President Richard Nixon had paid an astonishingly low amount in taxes in 1969 given his income for that year. After initially resisting calls for him to do so, Nixon eventually released his taxes and underwent an IRS audit. It turned out he had improperly claimed an exemption of $500,000 for papers he donated to the National Archives. [¶] Ever since this incident, it has been customary — though never required by law — for U.S. Presidential candidates to release their tax returns. Prior to 2016, only one candidate, President Gerald Ford in 1976, did not do so. Ford released a summary of

his return instead. [¶] During the 2016 campaign for U.S. President, Donald Trump broke with this longstanding tradition and refused to release his tax returns. Though prompted by Trump's break with the customary practice, this bill is not retroactive and would only apply to future presidential candidates." (Sen. Rules Com., Off. of Sen. Floor Analysis, Unfinished Business Analysis of Sen. Bill No. 27 (2019-2020 Reg. Sess.) as amended June 27, 2019, pp. 4-5.)[4]

Several of these analyses also considered constitutional issues that might be implicated by the tax return disclosure requirement.[5] However, these assessments concentrated on

---

[4]    Other analyses of Senate Bill No. 27 prepared while the bill was under consideration by the Legislature included similar background discussions. (Sen. 3d reading analysis of Sen. Bill No. 27 (2019-2020 Reg. Sess.) as amended June 27, 2019, p. 2; Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Sen. Bill No. 27 (2019-2020 Reg. Sess.) as amended Apr. 10, 2019, pp. 4-7; Assem. Com. on Appropriations, Analysis of Sen. Bill No. 27 (2019-2020 Reg. Sess.) as amended May 29, 2019, p. 2; Assem. Com. on Elections and Redistricting, Analysis of Sen. Bill No. 27 (2019-2020 Reg. Sess.) as amended May 29, 2019, p. 4; Sen. Judiciary Com., Analysis of Sen. Bill No. 27 (2019-2020 Reg. Sess.) as amended Mar. 11, 2019, pp. 4-5; Sen. Com. on Elections and Const. Amends., Analysis of Sen. Bill No. 27 (2019-2020 Reg. Sess.) as amended Mar. 11, 2019, p. 3.)

[5]    These analyses commonly expressed some uncertainty regarding whether courts would find the measure consistent with the United States Constitution. (E.g., Assem. Com. on Elections and Redistricting, Analysis of Sen. Bill No. 27 (2019-2020 Reg. Sess.) as amended May 29, 2019, pp. 4-6; Sen. Judiciary Com., Analysis of Sen. Bill No. 27 (2019-2020 Reg. Sess.) as amended Mar. 11, 2019, pp. 5-14; Sen. Com. on Elections and Const. Amends., Analysis of Sen. Bill No. 27 (2019-2020 Reg. Sess.) as amended Mar. 11, 2019, pp. 3-4.)

whether the disclosure requirement comported with the *federal* Constitution. The only analysis of Senate Bill No. 27 that mentioned the California Constitution was prepared for the Senate Judiciary Committee, and this evaluation discussed only the right to privacy conferred by the state charter (Cal. Const., art. I, § 1) — not article II, section 5(c). (Sen. Judiciary Com., Analysis of Sen. Bill No. 27, *supra*, p. 12, fn. 15.)[6]

The analysis prepared for the Senate Judiciary Committee recognized that Senate Bill No. 149 (2017-2018 Reg. Sess.), a similar proposal that also would have conditioned access to the presidential primary ballot on a candidate's disclosure of federal income tax returns, had been vetoed in 2017 by then-Governor Jerry Brown. The analysis recited a series of rhetorical questions Brown had posed in his veto message: " 'Today we require tax returns, but what would be next? Five years of health records? A certified birth certificate? High school report cards? And will these requirements vary depending on which political party is in power? A qualified candidate's ability to appear on the ballot is fundamental to our democratic system. For that reason, I hesitate to start down a road that well might

---

[6] A Senate Judiciary Committee analysis of the earlier Senate Bill No. 149 (2017-2018 Reg. Sess.) discussed how that measure had been amended while under consideration by the Legislature to avoid a potential conflict with article II, section 5, *subdivision (d)* of the state Constitution, which concerns the inclusion of candidates on the *general election* ballot. (Sen. Judiciary Com., Analysis of Sen. Bill No. 149 (2017-2018 Reg. Sess.) as amended Mar. 20, 2017, p. 11 [concluding the amendment "appears to eliminate the state constitutional concern"].) But that analysis did not recognize, much less address, the separate state constitutional issue presented by article II, section 5(c).

lead to an ever escalating set of differing state requirements for presidential candidates.' " (Sen. Judiciary Com., Analysis of Sen. Bill No. 27, *supra*, at p. 14.) The committee analysis acknowledged that "[t]here is, in fact, some precedent for this [that is, conditioning ballot access upon some disclosure by a presidential candidate]. In 2011, for example, the Arizona legislature passed a bill that would have required presidential candidates to submit a birth certificate in order to appear on the state's election ballot. The bill was vetoed by Governor Jan Brewer. According to a senior fellow with the National Conference of State Legislatures, 14 other states considered similar legislation." (*Ibid*.) But, the analysis continued, "In response to this line of concern, the authors assert their belief that democratically elected legislatures are equipped to make reasoned assessments about what information is sufficiently important to their constituents to warrant a disclosure requirement and what information is not. If legislators go too far in demanding disclosures of presidential candidates, their fully informed constituents can always elect other representatives who will retract the requirement." (*Id*., at p. 15.)

### B. Senate Bill No. 505

The Governor signed a separate measure, Senate Bill No. 505, into law on the same day he signed the Act. Senate Bill No. 505 codified several criteria to be applied by the Secretary of State in determining who is to be placed on the appropriate presidential primary ballot as (i) a "recognized candidate[] throughout the nation or throughout California for the office of President of the United States" under article II, section 5(c), or (ii) a "generally advocated for or recognized" candidate for that office, in the phrasing of statutes that prescribe rules for the

11

presidential primaries of specific political parties. (Elec. Code, §§ 6041, 6340, subd. (a), 6520, subd. (a), 6720, 6851.)

Prior to the enactment of Senate Bill No. 505, the only elaboration within the Elections Code of what it means to be a "recognized" candidate for president appeared in the aforementioned statutes, each specifically tailored to an individual party that has qualified to participate in the state primary election. (See Elec. Code, § 5100 [setting forth the criteria for party qualification for the primary election].) The earliest precursors of the current laws to this effect were enacted in the 1970s, shortly after Proposition 4 was approved by the voters. (See Elec. Code, former § 6010, added by Stats. 1975, ch. 1048, § 2, p. 2468; Elec. Code, former § 6210, added by Stats. 1975, ch. 1056, § 3, p. 2509; Elec. Code, former § 6110, added by Stats. 1975, ch. 1060, § 3, p. 2569; Elec. Code, former § 6310, added by Stats. 1974, ch. 1184, § 2, p. 2537.)

The terms of the current statutes vary somewhat from party to party. They presently provide that a candidate for president is to be placed on the appropriate presidential primary ballot when the Secretary of State finds the person to be, with regard to the Democratic Party, "generally advocated for or recognized throughout the United States or California as actively seeking the nomination of the Democratic Party for President of the United States," with the Secretary of State to "include as criteria for selecting [such] candidates the fact of qualifying for funding under the Federal Elections Campaign Act of 1974, as amended" (Elec. Code, § 6041); with regard to the Republican Party, "generally advocated for or recognized throughout the United States or California as a candidate for the nomination of the Republican Party for President of the United States" (*id.*, § 6340, subd. (a)); with regard to the

12

American Independent Party, "generally advocated for or recognized in the news media throughout the United States or California as actively seeking the nomination of the American Independent Party for President of the United States" (*id*., § 6520, subd. (a)); with regard to the Peace and Freedom Party, "generally advocated for or recognized throughout the United States or California as actively seeking the presidential nomination of the Peace and Freedom Party or the national party with which the Peace and Freedom Party is affiliated" (*id*., § 6720); and, with regard to the Green Party, "generally advocated for or recognized throughout the United States or California as actively seeking the presidential nomination of the Green Party or the national political party with which the Green Party is affiliated" (*id*., § 6851).

The available historical materials indicate that prior to the approval of Senate Bill No. 505, the Secretary of State relied on various criteria or factors in identifying "recognized" or "generally advocated for or recognized" candidates for president. In 1976, then-Secretary of State March Fong Eu explained that in developing an initial list of "active presidential candidates for California," she had "taken into consideration a number of factors, including the fact that the persons are announced candidates, appear to be actively campaigning, have qualified for matching federal funds under the 1974 amendments to the Federal Elections Campaign Act, and are slated to appear on other states' primary ballots." (Sect. of State, News Release, Secretary of State Eu Selects Presidential Candidates (Jan. 30, 1976) p. 1 (hereafter Secretary of State 1976 Presidential

Candidate Announcement).)    Similar criteria have been articulated by Eu's successors as Secretary of State.[7]

Senate Bill No. 505 added sections 6000.1 and 6000.2 to the Elections Code.  Section 6000.1 sets forth criteria for being identified as a "generally advocated for or recognized" or "recognized" candidate for president.  These criteria overlap to some extent with the factors applied by former Secretary of State Eu.  (Elec. Code, § 6000.1, subds. (a)-(e).)  Section 6000.2 further provides that on or before the 98th day prior to the presidential primary election, a candidate for president is to file a form with the Secretary of State, together with any supporting documentation, establishing that the candidate is a "generally advocated for or recognized" candidate under the standard set forth in section 6000.1.  (*Id.*, § 6000.2, subds. (a), (b).)

With this action, petitioners challenge only the income tax return disclosure requirement for presidential candidates that was adopted through Senate Bill No. 27.  Our analysis here

---

[7]    For the 2008 California presidential primary, for example, then-Secretary of State Debra Bowen stated that the determination of whether a person would appear on the primary ballot as a candidate for president "is based on a number of factors, including whether a candidate: [¶] . . . [p]articipates in candidate debates; . . . [a]ctively campaigns in California; . . . [a]ppears in public opinion polls; and/or  [¶]  . . . [q]ualifies for federal campaign matching funds. [¶] Additionally, Secretary Bowen asked each of the six California political parties to submit a list of candidates whom they recognize as seeking their party's nomination." (Sect. of State, News Release, Secretary of State Releases List of Presidential Candidates for February 2008 Presidential Primary (Oct. 5, 2007) p. 1 (hereafter Secretary of State 2008 Presidential Candidate Announcement).)

therefore need not, and does not, address the constitutionality of Elections Code sections 6000.1 and 6000.2.

## C. Procedural History

On August 6, 2019, petitioners filed an emergency petition for writ of mandate or other extraordinary or immediate relief with this court. The petition identifies Patterson as "an individual California voter, a registered Republican, and current Chairperson of the Petitioner California Republican Party." She alleges that she "desires to participate as a voter and to lead her state political party by supporting the inclusion of all qualified Republican Presidential candidates in the open Presidential primary." The petition for writ of mandate also alleges that Patterson "fears that a large number of Republican voters will be suppressed and discouraged from voting at the primary election as a result of the Secretary of State's implementation of [Senate Bill No. 27], if qualified Republican candidates are excluded from the Republican Party's Presidential primary ballot." The California Republican Party is identified as "the ballot-qualified statewide political party representing more than 4.7 million registered Republican voters," and the petition states that the party and "its adherents participate in the partisan Presidential primary," among other electoral contests.

Petitioners assert that the Act's income tax return disclosure requirement "plainly conflicts with the constitutional provision of [a]rticle II, section 5(c) guaranteeing an open Presidential primary." They request a writ of mandate that would prohibit respondent "from enforcing Elections Code sections 6883 and 6884 . . . as fundamentally inconsistent and in conflict with [a]rticle II, section 5(c)." Petitioners seek this

relief on an emergency basis because the Act's deadline for submission of tax returns to the Secretary of State is November 26, 2019 (98 days before the March 3, 2020 primary election; see Elec. Code, § 6883, subd. (a)), and "the sitting President of the United States who has announced that he is a Presidential candidate for the 2020 election has in the past declined to release his federal tax returns."

After requesting and receiving preliminary opposition from respondent, we ordered him to show cause why a writ of mandate should not issue. To ensure the timely disposition of the cause, we directed expedited briefing in which the parties would address, among other subjects, the history of Proposition 4 and related legislation, and any guidelines, including internal measures and protocols, that the Secretary of State has used to determine who are "recognized candidates throughout the nation or throughout California for the office of President of the United States."

## II. DISCUSSION

Petitioners and respondent advance divergent constructions of article II, section 5(c), which carry different implications for the constitutionality of Elections Code sections 6883 and 6884.

As has been explained, petitioners regard article II, section 5(c) as specifying a rule of inclusivity for presidential primary contests that cannot be infringed through legislation such as the Act. According to petitioners, article II, section 5(c) requires all individuals who are found to be "recognized candidates throughout the nation or throughout California for the office of President of the United States" to be named on the appropriate primary ballot, unless an affidavit of noncandidacy

is filed. And, their argument continues, even if one assumes that the Legislature may play a role in defining what it means to be "recognized . . . throughout the nation or throughout California" as a candidate "for the office of President of the United States," noncompliance with the Act's disclosure provisions cannot provide a basis for excluding a candidate from the ballot because a candidate's failure to file income tax returns with the Secretary of State is not a reasonable measure of whether a candidate is so recognized.

Respondent interprets article II, section 5(c) differently. He emphasizes the Legislature's expansive authority to adopt legislation concerning primary elections — as recognized both before and after the approval of Proposition 4 (e.g., *Libertarian Party v. Eu* (1980) 28 Cal.3d 535, 540; *Communist Party v. Peek* (1942) 20 Cal.2d 536, 544) — and argues that in amending the state Constitution to add the relevant text now found in article II, section 5(c), voters "did not vitiate the Legislature's ability to regulate [primary] elections and pass laws that, for instance, limit candidates to those within recognized parties, require forms to be filed, or require information to be disclosed to better educate California's voters." Respondent thus reads article II, section 5(c) as recognizing, rather than constraining, the Legislature's power to prescribe rules governing presidential primary elections. Pursuant to this authority, the Legislature may, in respondent's words, "enact laws regulating the process by which particular candidates appear on a party's primary ballot, *even if they are nationally recognized*." (Italics added.) From this perspective, the Act's income tax return disclosure requirement for presidential candidates, including its directive to the Secretary of State not to place the names of noncompliant

candidates on the primary ballot, represents an appropriate exercise of the Legislature's authority.

To summarize the analysis that follows, we agree with petitioners that whatever authority the Legislature may have in defining how presidential primaries are to occur in this state, the challenged sections of the Act exceed such authority and are unenforceable. These provisions purport to exclude from the California presidential primary ballot any candidate who does not comply with the income tax return disclosure requirement — even someone who is incontestably "recognized . . . throughout the nation or throughout California" as a candidate "for the office of President of the United States" under any reasonable construction of that phrasing. But as explained below, article II, section 5(c) is most naturally read as conveying a rule of inclusivity for presidential primary elections that the Legislature cannot contravene. This reading is strongly supported by the history of the constitutional text that now appears in article II, section 5(c). This history establishes beyond fair dispute that this language was adopted to ensure that the ballots for parties participating in the presidential primary election would include all persons within said parties deemed to be "recognized candidates throughout the nation or throughout California for the office of President of the United States," except for those candidates who filed affidavits of noncandidacy, so that voters in the primary election would have a direct opportunity to vote for or against these candidates.

Because the relevant provisions of the Act condition a presidential candidate's placement on the primary ballot on compliance with an additional requirement that is concededly not a reasonable measure of whether the candidate is "recognized" as such throughout the nation or California, it

conflicts with the rule specified by article II, section 5(c), and is for that reason invalid. (*People v. Navarro* (1972) 7 Cal.3d 248, 260 [when a statute conflicts with the Constitution, "the latter must prevail"].)[8]

## A.  Article II, Section 5(c)

Our interpretive task begins with the language of article II, section 5(c). (See *Kennedy Wholesale, Inc. v. State Bd. of Equalization* (1991) 53 Cal.3d 245, 249-250; cf. *Santos v. Brown* (2015) 238 Cal.App.4th 398, 409.) To reiterate, this provision states as follows: "The Legislature shall provide for partisan elections for presidential candidates, and political party and party central committees, including an open presidential primary whereby the candidates on the ballot are those found by the Secretary of State to be recognized candidates throughout the nation or throughout California for the office of President of the United States, and those whose names are placed on the ballot by petition, but excluding any candidate who has withdrawn by filing an affidavit of noncandidacy."

Respondent has not sought to justify the Act's income tax disclosure requirement on the ground that it represents a reasonable measure of whether someone is "recognized . . . throughout the nation or throughout California" as a candidate "for the office of President of the United States." At oral argument, counsel for respondent conceded that whether a

---

[8]     Because the issue is not before us, we need not decide here whether the tax return disclosure requirement can properly be applied to candidates for president who would qualify for the primary election ballot through the petition process articulated in article II, section 5(c).

candidate for president has filed recent tax returns with the Secretary of State is not indicative of whether the candidate is so "recognized."[9]

---

[9] Even apart from this concession, under any reasonable interpretation of the "recognized" language within article II, section 5(c), a candidate's failure to disclose tax returns to the Secretary of State would not establish that the candidate is not "recognized . . . throughout the nation or throughout California" as a candidate "for the office of President of the United States."

The word "recognized" is susceptible to somewhat different meanings. (Compare, e.g., Black's Law Dict. (4th ed. 1968) p. 1436, col. 2 [defining "recognized" as "[a]ctual and publicly known"] with Random House Dict. of the English Language (1973) p. 1199, col. 3 [defining "recognize" as, among other things, "to acknowledge or treat as valid"].) The repeated use of the word "throughout" within article II, section 5(c) suggests that the "recognized" language is concerned (although perhaps not exclusively) with a candidacy's prominence or pervasiveness. (See Webster's 3d New Internat. Dict. (1971) p. 2385, col. 1 [defining "throughout" as "in . . . every part of"].) If this meaning applies, it seems plain that whether a candidate has disclosed tax returns to the Secretary of State cannot, by itself, be determinative of whether the candidate is "recognized." Such disclosure has, at most, a highly attenuated relationship to public awareness of a candidacy throughout the nation or California — or, for that matter, to whether someone is an "[a]ctual" candidate for the presidency. (Black's Law Dict., at p. 1436, col. 2.)

The disjunctive "throughout the nation or throughout California" language in article II, section 5(c) also suggests that nondisclosure of tax returns under the Act could not supply a basis for keeping a presidential candidate off the primary ballot even if the "recognized" phrasing were to be construed as being to some extent concerned with a candidacy's validity. For even in that case, a failure to comply with the Act's tax return disclosure requirement would establish only that someone is not "recognized," i.e., not regarded as valid, as a presidential

Instead, as noted, respondent posits that the legislative authority envisioned by article II, section 5(c)'s directive that "[t]he Legislature shall provide for . . . an open presidential primary" includes the power to adopt additional prerequisites for appearing on the primary ballot that even a "recognized" candidate for president must satisfy.[10]

---

candidate in or by California. It would not mean that the candidate is not "recognized . . . throughout the nation," because a failure to satisfy this requirement would not make a candidacy invalid throughout the nation.

[10] Respondent's interpretation emphasizes language within article II, section 5(c) that acknowledges the Legislature's broad authority to provide for primary elections, a power that was already well-established at the time of the 1972 primary election at which Proposition 4 passed.

When the electorate approved Proposition 4, the state Constitution specifically described the Legislature's authority over primary elections as follows: "The Legislature shall have the power to enact laws relative to the election of delegates to conventions of political parties; and the Legislature shall enact laws providing for the direct nomination of candidates for public office, by electors, political parties, or organizations of electors without conventions, at elections to be known and designated as primary elections; also to determine the tests and conditions upon which electors, political parties, or organizations of electors may participate in any such primary election. . . ." (Cal. Const., art. II, former § 2.5.)

"The purpose of this [provision] was to give the Legislature a free hand in dealing with the evils which had formerly been prevalent in primary elections, even to the extent of excluding parties and individuals from participation therein." (*Communist Party v. Peek, supra,* 20 Cal.2d at p. 544.) This authority included the power to "determine the tests and conditions upon which participation in a primary election may be had either by electors as voters thereat or by electors as candidates thereunder." (*Socialist Party v. Uhl* (1909) 155 Cal.

But article II, section 5(c) is more readily construed as *both* recognizing the Legislature's authority to provide for primary elections *and* imposing a specific constraint on this power. This provision begins, "The Legislature shall provide for partisan elections for presidential candidates, and political party and party central committees" — language that, as respondent emphasizes, conveys the Legislature's responsibility to develop a primary election scheme. Immediately thereafter, however, the provision continues, "*including* an open presidential primary whereby the candidates on the ballot are those found by the Secretary of State to be recognized candidates throughout the nation or throughout California for the office of President of the United States . . . ." (Italics added.) *This* language appears to convey an absolute requirement of a presidential primary ballot for each qualifying party that includes all persons seeking the party's presidential nomination who have been found to be "recognized candidates throughout the nation or throughout California for the office of President of the United States." In other words, the presidential primary that the Legislature must "provide for" is one in which all persons deemed to be "recognized candidates throughout the nation or throughout California for the office of President of the

_____

776, 792.) In an early decision by this court construing article II, section 2½ of the Constitution (later renumbered section 2.5), we observed that "[t]he right is thus conferred to prescribe any reasonable test and it is the duty of the [L]egislature to prescribe one." (*Socialist Party*, at p. 792.)

Article II, section 2.5 of the California Constitution was repealed upon the approval of Proposition 7 by the electorate at the November 1972 general election. Today, the various subdivisions of article II, section 5 of the Constitution address how primary elections are to occur.

United States" are to appear on the appropriate primary ballot (along with presidential candidates who qualify for the ballot through the petition process), except for those candidates who file affidavits of noncandidacy pursuant to the final clause of article II, section 5(c). Under this interpretation, the Constitution prohibits the Legislature from adopting disclosure requirements that a presidential candidate identified as so recognized also must satisfy to appear on the primary ballot.

The text of article II, section 5(c), therefore, does not support respondent's view that the Legislature may adopt an income tax return disclosure requirement that could exclude "recognized candidates throughout the nation or throughout California for the office of President of the United States" from a presidential primary ballot. We now turn to the history of this provision, which removes any doubt regarding the intent behind article II, section 5(c).

### B. Historical Background

As approved by the electorate in 1972, Proposition 4 changed how candidates for the office of President of the United States qualify to be named on a primary ballot in this state. Before this measure came into effect, candidates for president had to take affirmative steps to enter the California primary. Advocates for ballot reform perceived that this system frustrated voters' ability to choose among a comprehensive array of candidates at presidential primary elections and diminished the state's influence in the national presidential nomination process. Proposition 4 responded to these concerns by requiring that *all* nationally or California-recognized candidates be included on the ballot, unless a person deemed to be such a candidate submits an affidavit of noncandidacy.

Because of this change to the presidential primary ballot, California voters now have the ability to express their preferences among candidates for their parties' presidential nominations more directly and meaningfully than had previously been the case.

### 1. *The Prior "Opt-in" Approach to the Primary Ballot*

The statutory scheme for primary elections that was in place in this state prior to Proposition 4 did not guarantee that even the most prominent presidential candidates would appear on a primary ballot. To appear on the ballot, a person had to submit to the Secretary of State written permission for delegate candidates to pledge themselves to that person. (Elec. Code, former § 6055.) The candidate for president would appear on the primary ballot if these candidates for delegates received enough signatures on nomination papers. (*Id.*, former §§ 6057, 6058, 6080-6088, 6804, 10261; see also *Review of Selected 1975 California Legislation* (1976) 7 Pacific L.J. 237, 439 ["Prior to 1974, presidential primary ballots for the major political parties in California listed only those candidates who petitioned to appear on the election ballot"].)

Under this regime, some noteworthy candidates for president avoided the California primary. In 1960, John F. Kennedy, who was elected president that November, was not among the candidates listed on the ballot for the Democratic Party primary contest. Instead, the only persons named on that ballot were then-Governor Pat Brown and activist George McLain. (Rarick, California Rising: The Life and Times of Pat Brown (2005) p. 182 (Rarick).) Similarly, in 1968 the eventual Republican Party nominee, Richard Nixon, did not appear on his party's California primary ballot. The only name printed on

that ballot was that of Ronald Reagan, the governor at that time. (Owens et al., California Politics and Parties (1970) p. 88 (Owens).) Hubert Humphrey, Nixon's rival as the Democratic Party nominee that autumn, did not directly participate in the 1968 California presidential primary, either. The Democratic Party primary ballot that year named only Senators Eugene McCarthy and Robert Kennedy, and then-Attorney General Thomas Lynch. (*Id*., at p. 84; Ross & Stone, California's Political Processes (1973) p. 37 (Ross & Stone).)

The candidacies of Brown in 1960 and Reagan in 1968 involved "favorite son" campaigns for president. "As a favorite son, a governor or senator entered his state's primary . . . even though he had no real hope of becoming president. Assuming that he won, the state's delegates would go to the convention pledged to him. On the convention floor favorite sons had two alternative strategies, which often overlapped. Sometimes they dreamed of snatching the nomination if none of the serious candidates could find a majority and the convention deadlocked. If not — and this was the more common outcome — they used their delegations as bargaining chips in dealing with potential nominees. Once the favorite son withdrew, the delegates were not legally obligated to follow his lead in voting for another candidate, but often, through a combination of intimidation or affection, a favorite son could lead his followers to one camp or another." (Rarick, *supra*, at p. 182; see also Davis, Presidential Primaries (2d ed. 1980) pp. 189-194 (Davis).)

Although the presence of a "favorite son" in a California presidential primary did not create a legal impediment to other candidates entering the fray, the presence of such a candidate could discourage national politicians from contesting the race. (Owens, *supra*, at pp. 87-88.) As one commentator observed in

1970, "Recent experience suggests that despite all the reasons for entering the California [primary] race, some active presidential aspirants decline to enter." (*Id*., at p. 87.) With a favorite son in the mix, "National candidates, out of courtesy, refrain[ed] from creating delegations in their own names." (Ross & Stone, *supra*, at p. 37.) An out-of-state candidate wading into a primary already populated by a favorite son not only invited an embarrassing loss to a more locally well-known contestant; he or she also risked "alienating party leadership in the state or damaging party unity, perhaps beyond repair, just prior to a general election campaign." (Owens, at p. 88). Meanwhile, the fact that a favorite son candidate was unlikely to secure a party's nomination for president "mean[t] that the voter voting for a favorite son in reality [did] not know what national candidate [would] be supported" by the delegates, who were initially pledged to the local candidate but became free to vote for other candidates once the favorite son withdrew from the race. (Ross & Stone, at p. 37; see Rarick, *supra*, at p. 182.)

Although favorite son candidacies were a longtime feature of the presidential primary landscape (see Davis, *supra*, at p. 90), as the 1960s progressed criticisms of these candidacies mounted in California. Critics attacked favorite son candidacies as hindering the ability of California voters to effectively express their preferences at the ballot box, and as limiting this state's relevance in the national presidential primary process. In an editorial following the failed Reagan candidacy in 1968, the Los Angeles Times newspaper opined, "Governor Reagan froze out all other Republican contenders by heading up a 'favorite son' delegation . . . [¶] The favorite son device is not new, here or elsewhere. It has been used in the past by both Democrats and Republicans. Yet the temper of the times is such that it should

26

now be discarded in favor of giving the voters a more direct and meaningful voice in the selection of their nominees." (*Toward Better Elections*, L.A. Times (Aug. 28, 1968) p. A4; see also *Governor's Veto of Primary Bill*, S.F. Chronicle (Sept. 3, 1968) p. 38 [editorial]; *Open Primary More Vital Than Ever*, San Jose Mercury News (Feb. 27, 1969) p. 2 [editorial].) Communicating a similar view among the electorate, one poll conducted in 1968 reported that 77 percent of those surveyed would have preferred a choice among candidates in the 1968 Republican Party primary, instead of only a delegate slate pledged to Governor Reagan. (Field Research Corp., The Field Poll, California Poll 68-03 (May 15-18, 1968).)

### 2. Earlier Attempts To Enact Responsive Statutes

The constitutional amendment adopted through Proposition 4 was approved by the voters in 1972 after repeated failures to enact statutes that would have made similar changes to the presidential primary ballot.

In 1965, 1967, 1968, 1969, and 1971, bills were introduced in the Legislature that, had they become law, would have replaced the existing "opt-in" scheme for presidential primary candidates with a more inclusive approach.[11] These proposals drew from an Oregon law (1961 Or. Laws, ch. 170, § 1, p. 181) that had made such a change to the presidential primary system in that state. (See Assem. Com. on Elections and Reapportionment, Analysis of Sen. Bill No. 145 (1968 Reg. Sess.) p. 1 ["Senate Bill 145 is an act to create for California a

---

[11] The bill introduced in 1965 applied only to the presidential primary of a party for which there were fewer than 3.5 million registered voters in the state. (Assem. Bill No. 1414 (1965 Reg. Sess.), *supra*, § 2 [proposed Elec. Code, § 6300].)

Presidential Primary system similar to the system now used in Oregon"].)

Each of the ballot reform measures introduced in the Legislature provided that the Secretary of State "shall place the name" of a candidate for president upon the presidential primary ballot when that state officer "shall have determined in his sole discretion that such a candidate" (or, in some versions of the proposed legislation, "such candidate's candidacy") "is generally advocated for or recognized in" the "news media throughout the United States."[12] (Sen. Bill. No. 3 (1971 Reg. Sess.) as introduced Jan. 4, 1971, § 2 [proposed Elec. Code, § 6052]; Sen. Bill. No. 3 (1969 Reg. Sess.) as introduced Jan. 7, 1969, § 2 [proposed Elec. Code, § 6052]; Sen. Bill No. 145 (1968 Reg. Sess.) as introduced Jan. 30, 1968, § 2 [proposed Elec. Code, § 6052]; Sen. Bill No. 586 (1967 Reg. Sess.) as introduced Mar. 14, 1967, § 2 [proposed Elec. Code, § 6051]; Assem. Bill No. 1414 (1965 Reg. Sess.) as introduced February 24, 1965, § 2 [proposed Elec. Code, § 6351].)[13] All of these bills would have allowed a candidate to avoid being placed on the ballot by executing an

---

[12] The proposed legislation introduced in 1971 would have added "or California" after "United States." (Sen. Bill. No. 3 (1971 Reg. Sess.), *supra*, § 2 [proposed Elec. Code, § 6052].)

[13] Each of these measures also made provision for the inclusion of additional candidates on the primary ballot when petitions on behalf of their candidacy had collected a sufficient number of signatures. (Sen. Bill No. 3 (1971 Reg. Sess.), *supra*, § 2 [proposed Elec. Code, §§ 6053-6059]; Sen. Bill No. 3 (1969 Reg. Sess.), *supra*, § 2 [proposed Elec. Code, §§ 6053-6059]; Sen. Bill No. 145 (1968 Reg. Sess.), *supra*, § 2 [proposed Elec. Code, §§ 6053-6056]; Sen. Bill No. 586 (1967 Reg. Sess.), *supra*, § 2 [proposed Elec. Code, § 6051]; Assem. Bill No. 1414 (1965 Reg. Sess.), *supra*, § 2 [proposed Elec. Code, § 6351].)

affidavit stating that the person was not, and did not intend to become, a candidate for president in the forthcoming election.[14]

The bills that were introduced in 1965 and 1967 died without a floor vote in either chamber of the Legislature. (Cal. Legis., Final Calendar of Legislative Business (1965 Reg. Sess.) p. 458; Sen. Final Hist. (1967 Reg. Sess.) p. 171.) The Assembly and the Senate passed the 1968, 1969, and 1971 bills,[15] but in each instance the legislation was vetoed by then-Governor Reagan. In his veto message rejecting Senate Bill No. 145 (1968 Reg. Sess.), Reagan wrote that this measure "adds nothing to

---

[14] As with the other proposed statutory reforms to the primary ballot discussed in the text, the bills would have incorporated this requirement into the Elections Code. (Sen. Bill No. 3 (1971 Reg. Sess.) § 2 [proposed Elec. Code, § 6061]; Sen. Bill No. 3 (1969 Reg. Sess.) § 2 [proposed Elec. Code, § 6061]; Sen. Bill No. 145 (1968 Reg. Sess.) § 2 [proposed Elec. Code, § 6058]; Sen. Bill No. 586 (1967 Reg. Sess.) § 2 [proposed Elec. Code, §§ 6051, 6052]; Assem. Bill No. 1414 (1965 Reg. Sess.) § 2 [proposed Elec. Code, §§ 6351, 6352].)

[15] The Assembly and Senate passed versions of the 1968, 1969, and 1971 bills that had been amended in the legislative process. These amendments are generally immaterial to the issues before the court, with the possible exception of one change made to the 1971 measure, Senate Bill No. 3 (1971 Reg. Sess.). That bill was amended in the Assembly to add the italicized language that appears below: "The Secretary of State shall place the name of a candidate upon the presidential primary ballot when the Secretary of State shall have determined in his sole discretion that such a candidate is generally advocated for or recognized in the news media throughout the United States or California as actively seeking his party's nomination for President of the United States *and that such a candidate has formed a delegation in conformity with the applicable provisions of this division.*" (Sen. Bill. No. 3 (1971 Reg. Sess.) as amended Nov. 24, 1971, § 1, italics added [proposed Elec. Code, § 6066].)

the democratic process. It is, in fact, an infringement on the rights of certain individuals. It limits the people's responsibility by placing the responsibility for putting names on the California presidential ballot on the shoulders of one man. This is considerably less desirable than California's open primary method which requires a significant number of persons to show an interest in a man's candidacy before his name can be placed on the ballot." (Governor's Veto Message to Sen. on Sen. Bill No. 145 (Aug. 22, 1968) 1969 Sen. J. (1968 Reg. Sess.) p. 4959.) Reagan issued similar veto messages in rejecting Senate Bill No. 3 (1969 Reg. Sess.), the ballot reform measure approved by the Legislature in its 1969 Regular Session (Governor's Veto Message to Sen. on Sen. Bill No. 3 (Sept. 4, 1969) 1969 Sen. J. (1969 Reg. Sess.) p. 5695 (hereafter 1969 Veto Message)), and the Senate Bill No. 3 that was approved by the Legislature in its 1971 Regular Session (Governor's Veto Message to Sen. on Sen. Bill No. 3 (Dec. 30, 1971) 1972 Sen. J. (1972 Reg. Sess.) p. 9939). In vetoing the 1969 measure, Reagan added, "If a candidate is, indeed, 'generally recognized' as a serious presidential contender, his supporters should have no difficulty in gathering sufficient signatures to place his name on the California ballot." (1969 Veto Message, *supra*, at p. 5696.)

### 3. The Electorate's Approval of Proposition 4 as a Constitutional Amendment, Creating an "Open Presidential Primary"

In 1970, after several attempts at making changes to the presidential primary election by statute had failed, a constitutional amendment with a similar goal (Sen. Const. Amend. No. 3 (1970 Reg. Sess.)) was introduced in the Legislature. This proposal would have added section 7 to article II of the state Constitution, with the text, "The Legislature shall

provide for an open presidential primary whereby the candidates on the ballot are those found by the Secretary of State to be recognized candidates throughout the nation or throughout California for the office of President of the United States, and those whose names are placed on the ballot by petition, but excluding any candidate who has withdrawn by filing an affidavit that he is not a candidate." (Sen. Const. Amend. No. 3 (1970 Reg. Sess.).) The Senate approved this proposed amendment, but it was tabled in the Assembly and never came before the electorate for approval. (Cal. Legis., Final Calendar of Legislative Business (1970 Reg. Sess.) p. 362.)

The next year, both chambers of the Legislature approved a similar proposal, Senate Constitutional Amendment No. 3 (1971 Reg. Sess.). (Sen. Final Hist. (1971 Reg. Sess.) p. 501.) This measure represented an alternative method of accomplishing the goals of the aforementioned Senate Bill No. 3 (1971 Reg. Sess.), in the event Governor Reagan vetoed the bill. (See letter from Sen. Alfred E. Alquist to Governor Ronald Reagan (Dec. 8, 1971) p. 1 [explaining that, should the Governor approve Sen. Bill No. 3 (1971 Reg. Sess.), the bill's sponsor would "utilize the appropriate legislative provisions for the removal of [the proposed constitutional amendment] from the June, 1972, ballot"].) After Governor Reagan vetoed Senate Bill No. 3 (1971 Reg. Sess.), Senate Constitutional Amendment No. 3 appeared on the ballot as Proposition 4 at the June 1972 primary election, at which time it was approved by the voters.

Proposition 4 added article II, section 8 to the state Constitution, providing, "The Legislature shall provide for an open presidential primary whereby the candidates on the ballot are those found by the Secretary of State to be recognized candidates throughout the nation or throughout California for

the office of President of the United States, and those whose names are placed on the ballot by petition, but excluding any candidate who has withdrawn by filing an affidavit that he is not a candidate." Subsequent amendments to the state Constitution have altered this phrasing somewhat and moved the pertinent text to article II, section 5(c), but have not made any changes fundamental to the issue before the court.[16]

The analysis and arguments regarding Proposition 4 that appeared within the ballot materials before the voters at the 1972 primary election provide substantial insight into the intent behind this measure. (See *People v. Gonzales* (2017) 2 Cal.5th 858, 881 [describing ballot materials as "a useful source of ascertaining voter intent"]; *Silicon Valley Taxpayers' Assn., Inc. v. Santa Clara County Open Space Authority* (2008) 44 Cal.4th 431, 445.) These materials situate the amendment in the historical context summarized above (see *Robert L. v. Superior Court* (2003) 30 Cal.4th 894, 904; *Hi-Voltage Wire Works, Inc. v. City of San Jose* (2000) 24 Cal.4th 537, 542, 560) and manifest an intent, through the measure, to require all "recognized" candidates for president to be placed on the appropriate party's primary ballot, in order to avoid the candidate participation problems associated with the then-existing primary process.

---

[16] Most recently, Proposition 14, which the electorate adopted in 2010 to create a new "top-two candidates open primary election" procedure for state and congressional primary elections, redesignated the presidential primary provision as subdivision (c) of section 5, article II, and slightly revised the opening passage of that subdivision to indicate that partisan elections are to be retained for presidential candidates and political party and party central committees.

Within the relevant ballot materials, the Legislative Counsel's general analysis of the measure explained, "A 'Yes' vote on this measure is a vote *to require* the placement on the presidential primary ballot of the names *of all recognized candidates* for president and all candidates qualified by virtue of nominating petitions, unless such a candidate withdraws. [¶] A 'No' vote is a vote to reject this requirement." (Ballot Pamp., Primary Elec. (June 6, 1972) general analysis of Prop. 4 by Legis. Counsel, p. 9, italics added (hereafter June 1972 Ballot Pamphlet).) The Legislative Counsel's detailed analysis added, in relevant part, "This measure would add Section 8 to article II of the California Constitution and direct the Legislature to provide for an open presidential primary. It would *require* the Secretary of State to place upon the presidential primary ballot of the appropriate political party as its candidates for the office of President of the United States, the names of those persons who he determined to be either (a) recognized as candidates throughout the nation or (b) recognized as candidates throughout California." (*Id*., detailed analysis of Prop 4. by Legis. Counsel, p. 10, italics added.)

The arguments in favor of Proposition 4 within the official ballot pamphlet also described how the measure would function, and explained why it was being proposed. Proponents stated, in pertinent part, "This Constitutional Amendment is designed to give voters a meaningful voice in choosing their party's presidential nominee. It requires the Legislature to provide for an open presidential primary in which the Secretary of State places on the ballot the names of recognized candidates for the office of President of the United States." (June 1972 Ballot Pamp., *supra,* argument in favor of Prop. 4, p. 10.) The argument in favor of Proposition 4 later continued, "The present

system of selecting presidential candidates often leaves the voter without a direct voice in the decision. The 'favorite son' device has been used by Governors from both parties to prevent a contested primary, depriving the voters of a chance to vote for the candidate of his choice. [¶] In the last presidential primary election, California voters were denied the opportunity of voting for or against either of the men who eventually became the presidential nominees. [¶] Opponents claim an open primary would impair 'party unity' and would require costly election campaigns. But who wants 'party unity' at the expense of party members? And why shouldn't the candidates campaign in California as well as in New Hampshire, Indiana, and Oregon? [¶] The open primary plan would make California the key state every presidential election. As the most populous state in the union, it should be. It is time the voters have a say in nominating their party's candidate for the highest office in the land." (*Ibid*.) Later, in rebutting the arguments advanced against Proposition 4, its advocates stated, "*By placing the names of all recognized candidates on the ballot* the Secretary of State can help ensure that Californians have a chance to choose which candidate they wish to represent their party. California is the most populous state in the Union and serves as a cross section of the entire nation. It is only fitting that our presidential primary should be important in the selection of presidential nominees. [¶] The open presidential primary will free the voters of California to choose their own candidates for President of the United States and take the decision out of the smoke-filled rooms." (June 1972 Ballot Pamp., *supra,* rebuttal to argument against Prop. 4, p. 11, italics added.)

The opponents of Proposition 4, meanwhile, argued in their statements to voters within the ballot materials that the

existing regime did not meaningfully impede the ability of leading candidates for president to appear on the primary ballot. They explained that "[t]o appear on the ballot, a candidate and his supporters need only gather a reasonable number of signatures of registered voters who wish to have the candidate's name placed on the ballot." (June 1972 Ballot Pamp., *supra*, argument against Prop. 4, p. 11.) Thus, with regard to Richard Nixon and Hubert Humphrey, the Republican and Democratic Party nominees in 1968 who had not participated in that spring's California primary, "if one or both of those men had desired to place their name before their own party members in California in June 1968, they could have done so. There is absolutely nothing in present law which prevented them from entering the primary. For their own reasons, they chose not to do so." (*Id.*, rebuttal to argument in favor of Proposition 4, p. 10.)

The opponents of Proposition 4 characterized the measure as objectionable because it would deny future presidential candidates the right to similarly choose whether to participate in the state primary. They asserted, "Proposition 4 *forces* a candidate to enter the California primary. This means that he must commit an immense amount of time and money to a campaign here, even though he may feel that his chances for the nomination might better be served by using that time and money elsewhere." (June 1972 Ballot Pamp., *supra*, argument against Prop. 4, at p. 11.) The opponents maintained that "each presidential candidate should be free to decide which primaries he will enter, and Proposition 4 will deny such candidates their

freedom of decision." (*Id*., rebuttal to argument in favor of Prop. 4, p. 10.)[17]

The consistent characterizations of Proposition 4 within the ballot materials provided to voters at the June 1972 primary election illuminate the intent behind this measure. They establish that this legislative constitutional amendment responded to concerns that voters in previous California presidential primary elections had not consistently been provided with an adequate choice among candidates for president. To address this problem, the proposition upended the preexisting system, in which all candidates had to take affirmative steps to appear on the primary election ballot, and

---

[17]    Analyses of Senate Constitutional Amendment No. 3 (1971 Reg. Sess.) that were prepared before Proposition 4 came before the electorate for approval reflect a similar understanding of the ballot measure. An analysis by the Assembly Committee on Elections and Reapportionment stated that the measure "would place on the . . . ballot the question whether California should have an 'open' Presidential primary. *Under the measure the Secretary of State would be required to place all publicly recognized candidates for President on the primary ballot.* Other candidates could qualify by petition. A candidate could withdraw by filing an affidavit that he is not a candidate." (Assem. Com. on Elections and Reapportionment, Analysis of Sen. Const. Amend. No. 3 (1971 Reg. Sess.) p. 1, italics added.) A summary by the Legislature's Constitutional Amendments Committee similarly explained that the measure "*[r]equires [the] Secretary of State to place all publicly recognized candidates for President on the primary ballot.* Other candidates could qualify by petition. Any candidate could withdraw his name by filing an affidavit with the Secretary of State stating that he is not a candidate." (Const. Amends. Com., Final Summary of Selected Legislation Relating to Amending the Cal. Const. (1971 Reg. Sess.) p. 7, italics added.)

had sometimes declined to do so. That paradigm was replaced by one in which the Secretary of State must place on the ballot *all* persons found to be "recognized . . . throughout the nation or throughout California" as candidates for president within parties that qualify for the primary election (along with candidates who qualify through the petition process), except for candidates who file affidavits of noncandidacy.[18]

## C. Subsequent Developments

The foregoing establishes that when Proposition 4 was approved by voters, it was understood to require that all persons identified as "recognized candidates throughout the nation or throughout California for the office of President of the United States" be included on the appropriate primary ballot, absent an affidavit of noncandidacy. The subsequent affirmation and implementation of the ballot reform effected by Proposition 4 manifest a similar understanding.

First, at the November 1972 general election, voters approved Proposition 7. This proposition adopted several recommendations of the Constitutional Revision Commission

---

[18]  These ballot materials also clarify that the affidavit of noncandidacy that would remove a "recognized" candidate for president from the ballot must do more than merely disavow participation in the California primary. The argument in favor of Proposition 4 stated, "Persons placed on the ballot and wishing to be removed may withdraw simply by filing an affidavit *that they are not a candidate for President*." (June 1972 Ballot Pamp., *supra*, argument in favor of Prop. 4, p. 10, italics added.) The arguments made by the measure's opponents in the ballot materials, such as their assertion that it would deny presidential candidates their "freedom of decision" regarding "which primaries [to] enter" (*id.*, rebuttal to argument in favor of Prop. 4, p. 10), carry similar connotations.

regarding article II of the state Constitution, relating to elections. Among its provisions, Proposition 7 renumbered article II, section 8 of the state Constitution as article II, section 4, and revised the introductory language of this section to provide (the italicized language being added through the proposition), "[t]he Legislature shall provide for *primary elections for partisan offices, including* an open presidential primary whereby the candidates on the ballot are those found by the Secretary of State to be recognized candidates throughout the nation or throughout California for the office of President of the United States, and those whose names are placed on the ballot by petition, but excluding any candidate who has withdrawn by filing an affidavit that he is not a candidate." (Ballot Pamp., Gen. Elec. (Nov. 7, 1972) text of Prop. 7, appen. p. 9, italics added (hereafter November 1972 Ballot Pamphlet).)[19]

Concerning this provision, opponents of Proposition 7 revived an argument that had been made against Proposition 4 at the preceding June 1972 primary election, asserting that the electorate should vote against the later measure because voters should not allow "the Secretary of State in his judgment and his judgment alone [to] pass[] on the candidate's 'recognition,' and thus decid[e] as a practical matter which candidates will be voted on by the people. This is too important a matter to be left to the judgment of any one person." (Nov. 1972 Ballot Pamp.,

---

[19] A subsequent amendment to the Constitution, approved by the voters as Proposition 14 in June 1976, shifted this text (with its language regarding the affidavit of noncandidacy having been made gender-neutral through the intervening passage of Prop. 11 in November 1974) to article II, section 5 of the Constitution.

*supra*, argument against Prop. 7, p. 20.) The proponents of Proposition 7 cast the issue as already settled by Proposition 4, explaining, "The open presidential primary was added to the Constitution by the people in June 1972. A 'Yes' vote merely renumbers that provision to conform to other language in Article II." (Nov. 1972 Ballot Pamp., *supra*, rebuttal to argument against Prop. 7, p. 20.) Nothing associated with this back-and-forth, which implicitly equated a candidate's " 'recognition' " (*id.,* argument against Prop. 7, p. 20) with that candidate's appearance on the primary ballot, suggests a view that under the Constitution as amended earlier that year through Proposition 4, the Legislature retained the authority to adopt disclosure requirements for presidential candidates that could function to exclude from the ballot even "recognized candidates throughout the nation or throughout California for the office of President of the United States."

Actions taken to implement Proposition 4 shortly after its approval also offer no indication of such an understanding. Two years after Proposition 4 passed, the Legislature enacted the Alquist Open Presidential Primary Act (Stats. 1974, ch. 1184). This statute revamped the procedures applicable to the Democratic Party presidential primary. As enacted, the sole requirement within this statute for inclusion on a presidential primary ballot was that a candidate be deemed "generally advocated for or recognized in the news media throughout the United States or California as actively seeking the nomination of the Democratic Party for President of the United States." (See Stats. 1974, ch. 1184, § 2, p. 2537 [Elec. Code, former § 6310].) Substantively similar language was included in other presidential primary laws, applicable to other political parties, passed by the Legislature shortly thereafter. (See Elec. Code,

former § 6010, added by Stats. 1975, ch. 1048, § 2, p. 2468; Elec. Code, former § 6210, added by Stats. 1975, ch. 1056, § 3, p. 2509; Elec. Code, former § 6110, added by Stats. 1975, ch. 1060, § 3, p. 2569.)

By contemplating that a presidential candidate would appear on the appropriate primary ballot when found to be "generally advocated for or recognized" in the specified manner, these statutes and their present-day counterparts (Elec. Code, §§ 6041, 6340, subd. (a), 6520, subd. (a), 6720, 6851) convey a conception of article II, section 5(c) that is consistent with the one we adopt. As with the approval of Proposition 7 by the electorate, nothing within these laws implies a view that the Legislature can adopt disclosure requirements for presidential candidates that, if not complied with, would keep persons determined to be "recognized candidates throughout the nation or throughout California for the office of President of the United States" from appearing on a primary ballot.

Similarly, there is no indication that the Secretary of State has traditionally construed article II, section 5(c) or its predecessor provisions as contemplating additional requirements for appearing on a presidential primary ballot, unrelated to whether someone is a "recognized candidate[] throughout the nation or throughout California for the office of President of the United States." As discussed *ante*, when Secretaries of State have disclosed the factors they took into account in deciding whether a person qualified to appear as a candidate on a presidential primary ballot, these considerations all have had a reasonable relationship to whether a candidate was known throughout the nation or California, or was actively participating in the presidential race. (E.g., Sect. of State 2008 Presidential Candidate Announcement, *supra*, at p. 1; Sect. of

State 1976 Presidential Candidate Announcement, *supra*, at p. 1.)

Last, although as has been explained there was no discussion of article II, section 5(c) in connection with legislative deliberations over Senate Bill No. 27 (2019-2020 Reg. Sess.), such a conversation did occur when the Legislature debated Senate Bill No. 505, which was enrolled and signed by the Governor on the same days as Senate Bill No. 27. Committee analyses of Senate Bill No. 505 reflect a common understanding that under article II, section 5(c), all presidential candidates found to be "recognized . . . throughout the nation or throughout California" must appear on the appropriate qualifying party's ballot unless an affidavit of noncandidacy is filed. Two of these analyses state that Proposition 4 "placed on the 1972 primary ballot the question whether California should have a Presidential primary that required the SOS [Secretary of State] to place all publicly recognized candidates for President on the primary ballot." (Sen. Com. on Elections and Const. Amends., Analysis of Sen. Bill No. 505 (2019-2020 Reg. Sess.) as amended March 25, 2019, p. 5; Sen. Rules Com., Office of Floor Analyses, Analysis of Sen. Bill No. 505 (2019-2020 Reg. Sess.) as amended May 30, 2019, at p. 6.)

In short, by all available indications, for more than four decades after Proposition 4's approval in 1972, the electorate, the executive, and the Legislature all interpreted the constitutional text now found at article II, section 5(c) similarly to how we construe it, i.e., as requiring an open presidential primary in which all persons within qualifying parties found to be "recognized candidates throughout the nation or throughout California for the office of President of the United States" are to be included on the appropriate presidential primary ballot.

## D. The Act's Income Tax Return Disclosure Requirement Conflicts with Article II, Section 5(c) and Cannot Be Enforced

It follows from the discussion above that insofar as sections 6883 and 6884 of the Elections Code make a presidential candidate's disclosure of income tax returns an absolute prerequisite for having the Secretary of State print the candidate's name on a primary ballot, this requirement conflicts with the more inclusive presidential primary that the electorate endorsed when it approved Proposition 4.[20]

---

[20] In his preliminary opposition, respondent argued that petitioners lack standing to pursue a writ of mandate, and that section 13314 of the Elections Code makes the Superior Court for the County of Sacramento the exclusive venue for this action. (Elec. Code, § 13314, subds. (a)(1), (b).) His response to our order to show cause stated that it incorporated by reference the arguments made in the preliminary opposition, but respondent did not otherwise renew these arguments in responding to our order to show cause — even as he advanced other reasons why no writ should issue.

Assuming these arguments remain before us, they lack merit. We perceive no standing issue that keeps us from deciding the important issues presented in the petition. (See Code Civ. Proc., § 1086; Elec. Code, § 13314, subd. (a)(1); *Save the Plastic Bag Coalition v. City of Manhattan Beach* (2011) 52 Cal.4th 155, 166, 170, fn. 5; *Weatherford v. City of San Rafael* (2017) 2 Cal.5th 1241, 1247-1248.) Meanwhile, article VI, section 10 of the California Constitution vests this court with "original jurisdiction in proceedings for extraordinary relief in the nature of mandamus." Although Elections Code section 13314, subdivision (b) states that "[v]enue for a proceeding under this section shall be exclusively in Sacramento County [when]: [¶] (1) The Secretary of State is named as a real party in interest or as a respondent," we do not read this provision as depriving this court of its original jurisdiction to entertain

As has been explained, Proposition 4 was approved by the electorate after voters had been denied the opportunity in previous California primary elections to vote for or against leading candidates for president, with several prominent candidates for that office having declined to take the steps necessary to qualify for the primary ballot. To avoid a recurrence in future primaries, Proposition 4 instituted a system whereby *all* persons within qualifying parties who are found to be "recognized candidates throughout the nation or throughout California for the office of President of the United States" must be included on the appropriate presidential primary ballot, unless they file an affidavit of noncandidacy, along with candidates who qualify for the ballot through the petition process. This reform advanced the interest of California voters in more consistently having direct and substantial influence in the primary process.

Allowing the income tax return disclosure requirement before us to stand could effectively revoke article II, section 5(c)'s guarantee to voters of a choice among all "recognized" candidates for president who do not file affidavits of noncandidacy. The statutory prerequisite, if not complied with, would exclude from the ballot even someone who is actively seeking the presidential nomination of a political party that participates in the primary election, and is widely regarded as a leading contender for that nomination — precisely the sort of presidential candidate that article II, section 5(c) specifies *must*

---

petitions such as the one at bar. (See *Vandermost v. Bowen* (2012) 53 Cal.4th 421, 451; *California Redevelopment Assn. v. Matosantos* (2011) 53 Cal.4th 231, 252-253.)

appear on the ballot, absent the filing of an affidavit of noncandidacy.

In arguing that the Legislature may properly condition a presidential candidate's access to the primary ballot on compliance with the Act's disclosure requirement, respondent emphasizes the Legislature's broad authority to provide for a system of primary elections, including presidential primaries. (E.g., *Libertarian Party v. Eu*, *supra*, 28 Cal.3d at p. 540.) Prior to the adoption of Proposition 4, we recognized that this authority includes the ability to enact reasonable rules that may operate to exclude some candidates from the primary ballot. (E.g., *Communist Party v. Peek*, *supra*, 20 Cal.2d at pp. 542-545.) But as discussed *ante*, the language and history of article II, section 5(c) establish that this general authority does not include the more specific power to exclude persons found to be "recognized candidates throughout the nation or throughout California for the office of President of the United States" from appearing on the ballot of a party that participates in the primary election. Whatever the Legislature's authority may be to define ground rules for presidential primary elections, article II, section 5(c) also includes a requirement of an inclusive ballot that such legislation must respect and embrace.

Respondent further asserts that the Legislature's general power to provide for primary elections makes it both inevitable and appropriate that it will have some role in defining, directly or indirectly, who will appear on the primary ballot as a candidate for president. Making this point, respondent states in his briefing that "[t]he Legislature has already permissibly acted to define who may be a 'recognized candidate' through laws that only allow candidates identified with qualified parties to appear on ballots."

It is true that under current law, individuals who compete for the presidential nominations of parties that have not qualified to participate in the state primary election (see Elec. Code, § 5100) will not have their names printed on the primary election ballot, because with these candidates, there is no party ballot to appear on. This is true regardless of whether such a candidate might meet generic criteria for being "recognized . . . throughout the nation or throughout California" as a candidate "for the office of President of the United States." We have no need here, however, to decide whether the presidential primary laws of this state relating to subjects such as the necessary qualifications of participating political parties also may implicate article II, section 5(c).[21] Respondent's observation regarding the exclusion of candidates from nonparticipating parties is adequately addressed by observing that whatever questions may exist about the intent behind Proposition 4, this measure manifestly sought to provide California voters eligible to vote for a political party that participates in the primary election with the opportunity to choose among all "recognized" candidates seeking the presidential nomination of that party — except, again, for those candidates who have filed affidavits of noncandidacy. Insofar as the Act would make such a candidate's disclosure of income tax returns a requirement for inclusion on a qualifying party's primary ballot, its provisions conflict with this intent, and are therefore unconstitutional.

---

[21] Nor, given the limited ambit of article II, section 5(c), do we have occasion to opine on conditions for appearing on the primary ballot that may be placed on candidates for political offices *other* than President of the United States.

Finally, respondent observes that Proposition 4 omitted language found in the earlier proposed legislation relating to the presidential primary ballot, discussed *ante*, that was introduced between 1965 and 1971 but failed to become law. These unsuccessful measures all had provided that the Secretary of State would determine "in his sole discretion" whether a candidate was sufficiently "recognized" to be included on the primary ballot. (Sen. Bill. No. 3 (1971 Reg. Sess.) as introduced Jan. 4, 1971, § 2; Sen. Bill. No. 3 (1969 Reg. Sess.) as introduced Jan. 7, 1969, § 2; Sen. Bill No. 145 (1968 Reg. Sess.) as introduced Jan. 30, 1968, § 2; Sen. Bill No. 586 (1967 Reg. Sess.) as introduced Mar. 14, 1967, § 2; Assem. Bill No. 1414 (1965 Reg. Sess.) § 2.)

Respondent would have us infer from the absence of this "sole discretion" language in Proposition 4 that voters, in approving this measure, intended for the Legislature to have the authority to exclude even "recognized" candidates for president from the primary ballot. This argument reads far too much into this shift in phrasing. In light of the text and history of article II, section 5(c), the most that can be said is that the Legislature might properly claim some role in defining when someone is "recognized . . . throughout the nation or throughout California" as a candidate "for the office of President of the United States," with the precise parameters of any such authority to be defined another day, in another case. Yet article II, section 5(c) also clearly prohibits the Legislature from imposing prerequisites such as the income tax return disclosure requirement before us

that a presidential candidate who is so recognized also must satisfy in order to appear on a primary ballot.[22]

### E. Petitioners Are Entitled to a Writ of Mandate

Respondent argues that no writ of mandate should issue because the Secretary of State has some discretion in determining who is "recognized . . . throughout the nation or throughout California" as a candidate "for the office of President of the United States," and therefore, according to respondent, "there is no purely ministerial duty that can be mandated by this Court." But "a writ of mandate is available, in the absence of a 'plain, speedy, and adequate remedy, in the ordinary course of law' (Code Civ. Proc., § 1086), against the implementation of an invalid statute." (*Hotel Employees & Restaurant Employees Internat. Union v. Davis* (1999) 21 Cal.4th 585, 590.) We have in the past issued writs of mandate directing state officers not to enforce statutes we found unconstitutional. (*Hardie v. Eu* (1976) 18 Cal.3d 371, 380; *Sail'er Inn, Inc. v. Kirby* (1971)

---

[22] Moreover, it is debatable at best whether this difference in phrasing between the unsuccessful earlier measures and Proposition 4 is even material to the interpretative question before the court. This distinction was not brought before the electorate in the ballot materials associated with this proposition. In fact, voters were told by the opponents of Proposition 4 that, in this respect, the amendment would function similarly to the scheme envisioned by the earlier measures. (June 1972 Ballot Pamp., *supra*, argument against Prop. 4, p. 11 [asserting that the proposition would "give[] just one man, the California Secretary of State, the right to determine which names will be placed on the ballot for the highest office in this country"].)

5 Cal.3d 1, 22; see also *Planned Parenthood Affiliates v. Van de Kamp* (1986) 181 Cal.App.3d 245, 263 ["[p]rohibitory mandate has also been used to restrain state officials from enforcing ministerial statutory provisions found to be unconstitutional"].) This case is similar, and we perceive no limitation on the writ that would prevent it from being issued here.

## III. DISPOSITION

We hold that Elections Code sections 6883 and 6884 are invalid under article II, section 5(c) of the California Constitution insofar as they purport to require someone who is "recognized . . . throughout the nation or throughout California" as a candidate for the office of President of the United States to file with the Secretary of State federal income tax returns as a necessary condition for appearing on the primary election ballot of a political party that has qualified to participate in that election. In accordance with this holding, let a peremptory writ of mandate issue that directs the Secretary of State to refrain from enforcing Elections Code sections 6883 and 6884 as to such candidates. Our judgment is final forthwith. (See *Vandermost v. Bowen, supra,* 53 Cal.4th at p. 486; *California Redevelopment Assn. v. Matosantos, supra,* 53 Cal.4th at p. 276.)

**CANTIL-SAKAUYE, C. J.**

**We Concur:**

**CHIN, J.**
**CORRIGAN, J.**
**LIU, J.**
**CUÉLLAR, J.**
**KRUGER, J.**
**GROBAN, J.**

PATTERSON v. PADILLA

S257302


Concurring Opinion by Justice Cuéllar


Our holding in this case is narrow. The Legislature cannot bar from the presidential primary election ballot a candidate "found by the Secretary of State to be recognized . . . throughout the nation or throughout California" (Cal. Const., art. II, § 5, subd. (c)), even if that candidate fails to disclose five years' worth of federal tax returns as required by Elections Code section 6883. The limited scope of this holding leaves intact key portions of the Presidential Tax Transparency and Accountability Act. (Stats. 2019, ch. 121.)

Nothing in the court's decision, for example, prohibits the Legislature from finding that "as one of the largest centers of economic activity in the world, the State of California has a special interest in the President refraining from corrupt or self-enriching behavior while in office." (Elec. Code, § 6881.) And no party to this case disputed the fact that voters "can better estimate the risks of any given Presidential candidate engaging in corruption or the appearance of corruption if they have access to candidates' tax returns," given how a "Presidential candidate's income tax returns provide voters with essential information regarding the candidate's potential conflicts of interest, business dealings, financial status, and charitable donations." (*Ibid*.)

Nor does our holding prohibit the Legislature from encouraging or seeking such information from a presidential

1

candidate, so long as provision of that information is not a condition for the recognized candidate's name to appear on California's primary election ballot. But it's worth noting, too, that an interest in the financial transparency of those seeking to become the Chief Executive of the United States is not one of those attributes distinctive to California. Indeed, it's quite easy to find the tax returns disclosed by our nation's Presidents, with only a few exceptions, dating back to 1932 on various news and stand-alone websites, as well as the tax returns disclosed by many of the unsuccessful candidates over the past 40 years. The general availability of this information reflects an ongoing public and historical interest in the financial honesty and competence of those seeking the highest office in the land.

That the public, through moral suasion or a legal requirement crafted by its elected representatives, has so often succeeded in forcing disclosure of essential financial information about political candidates would not have come as a surprise to our nation's founders. As Thomas Jefferson cautioned in the first years after independence, "[t]he time to guard against corruption and tyranny is before they shall have gotten their hold on us. It is better to keep the wolf out of the fold, than to trust to drawing his teeth and talons after he shall have entered." (Jefferson, The Jefferson Cyclopedia: A Comprehensive Collection of the Views of Thomas Jefferson (Foley ed. 1900) p. 210.) The force of that warning remains undiluted by today's decision.

**CUÉLLAR, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion**  Patterson v. Padilla

_____

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding XXXX**
**Review Granted**
**Rehearing Granted**

_____

**Opinion No.**  S257302
**Date Filed:** November 21, 2019

_____

**Court:**
**County:**
**Judge:**

_____

**Counsel:**

Bell, McAndrews & Hiltachk, Charles H. Bell, Thomas W. Hiltachk and Terry J. Martin for Petitioners.

Xavier Becerra, Attorney General, Thomas S. Patterson, Assistant Attorney General, Anthony R. Hakl, Jay C. Russell and Chad A. Stegeman, Deputy Attorneys General, for Respondent.

Boies Schiller Flexner, David Boies, Maxwell V. Pritt and Alexander J. Holtzman for Dean Erwin Chemerinsky as Amicus Curiae on behalf of Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Thomas W. Hiltachk
Bell, McAndrews & Hiltachk
455 Capitol Mall, Suite 600
Sacramento, CA  95814
(916) 442-7757

Jay C. Russell
Deputy Attorney General
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004
(415) 510-3617